Argued October 12, affirmed November 10, 1954

# PETERSON *v.* VALLEY PACKING CO.

276 P2d 403

*John D. Nichols,* Assistant Attorney General, of Salem, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General, of Salem, and Blaine Hallock, of Baker.

*Manley B. Strayer* and *George W. Mead,* of Portland, argued the cause and filed a brief for respondent.

Benson & Davis, of Portland, filed a brief for Portland Union Stock Yards Company as amicus curiae, urging affirmance.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, BRAND, TOOZE and PERRY, Justices.

TOOZE, J.

This is an action by E. L. Peterson, director of the Department of Agriculture, State of Oregon, plaintiff, against Valley Packing Co., a corporation, defendant, to recover the sum of $366, as charges for brand inspection of cattle at the Salem, Oregon, packing plant of defendant. The case was tried to the court without a jury's intervention. Judgment was entered in favor of defendant; plaintiff appeals.

The brand inspection was performed and recovery is sought by plaintiff pursuant to his interpretation of the provisions of ch 193, Oregon Laws 1949. This act is otherwise known as the "Livestock Identification and Theft Prevention Act."

The facts are undisputed. Defendant operates a meat-packing plant in Salem, Oregon. It purchases livestock and slaughters them at its plant. Between August 23, 1949, and May 6, 1951, defendant purchased, and there were delivered to its Salem plant, 1464 head of cattle, which plaintiff claims were brand inspected

by him after their arrival in Salem. It is to recover the charges for such inspection that plaintiff brings this action.

The 1464 cattle involved in this case were shipped from outside the state of Oregon to commission firms at the Portland Union Stock Yards for sale. The Portland Union Stock Yards is a "posted market" under the Federal Packers and Stockyards Act. The commission agents operating at such yards are approved by the United States Department of Agriculture. The cattle were sold by the commission firms, as agents of the out-of-state shipper, to the defendant, and were shipped by rail to defendant's Salem plant.

All the cattle involved were shipped by common carrier from the out-of-state shipping points to the Portland Union Stock Yards, and were accompanied by the usual way bills and freight bills. All were subject to what is known as "diversion privileges". This means that the Portland-Salem movement (after purchase by defendant) was on the same shipping bill as the prior movement to the Stock Yards in Portland, at the same freight rate, and not on a new billing which would entail a higher freight rate.

Plaintiff contends that the movement of the cattle in interstate commerce terminated at the Stock Yards in Portland, and that the shipment from the Stock Yards to the Salem packing plant of defendant constituted a new shipment "originating in Oregon", and by reason thereof, the cattle in question were subject to brand inspection under the provisions of ch 193, Oregon Laws 1949. Defendant contends that the interstate character of the shipment did not terminate until the cattle arrived in Salem. Defendant further contends that should the shipment from Portland to Salem be considered as an intrastate shipment, and not as

a continuation of the interstate movement from the original out-of-state points, then the provisions of ch 193, Oregon Laws 1949, requiring brand inspection, would be invalid as constituting an unreasonable burden upon interstate commerce in livestock.

This is the second time that we have been called upon to construe the provisions of ch 193, Oregon Laws 1949, as they relate to shipments of cattle by out-of-state shippers to the Stock Yards in Portland, where the cattle are sold and then transported to the plants of the purchasers in Oregon. In *Swift & Co.* and *Armour & Co. v. Peterson,* 192 Or 97, 233 P2d 216, Mr. Justice WARNER, speaking for the court, thoroughly analyzed and construed this statute. The entire text of the statute is set forth as an appendix to the opinion.

After a most painstaking analysis of all the provisions of ch 193, Oregon Laws 1949, Mr. Justice WARNER stated the following conclusion: "* * * the only livestock amendable to brand inspection under the Act of 1949 are those which are a part of shipments originating in the state of Oregon, * * *." He stated further: "* * * the legislature had no intention to reach shipments originating outside of the state, well knowing that it had neither jurisdiction nor power to compel the execution of such certificates by persons charged with such shipments".

But, as noted, plaintiff now contends that the shipment from Portland to Salem constituted a new shipment which originated in the state of Oregon, and that under our original opinion the cattle in question were subject to brand inspection. However, plaintiff overlooks the fact that this precise question was before us in the prior case. Both Swift & Co. and Armour & Co., the plaintiffs in the prior litigation, purchased livestock received at the Portland Union Stock Yards from

out-of-state shippers and then transported their purchases to their own slaughtering plants in Portland, just as the Valley Packing Co. made its purchases at the Stock Yards and then transported the cattle to Salem. As to those cattle so purchased at the Stock Yards by plaintiffs in the prior case, and by them transported from the Stock Yards to their own packing plants, we said that the shipments did not originate in the state of Oregon, and that the cattle so purchased and transported were not subject to brand inspection. Insofar as the interstate character of the shipment is concerned, it is immaterial that in the prior case the transportation from the Stock Yards to the plants of Swift & Co. and Armour & Co. in Portland involved short distances only, as compared to the 53-mile distance between Portland and Salem in the instant litigation; neither does the means of transportation employed between stockyards and packing plants make any difference.

In the prior case the plaintiff in this case, the defendant there, filed a petition for rehearing in this court, suggesting that our opinion endowed livestock, which have been imported into Oregon, with a continuing immunity from the operation of the brand-inspection law. In denying the petition for rehearing, we stated the question presented by the petition as follows: "Does livestock not become part of the mass of property within this state, as do other subjects of commerce, when the interstate shipment thereof is ended and the animals come into the possession of Oregon owners?"

Replying to the question, Mr. Justice WARNER wrote (p 138):

"We do not think that the reasons assigned for that query, nor the query itself, are warranted by any language found in the original opinion.

"It is not always easy to determine the exact moment when any given shipment in interstate transportation comes to an end or its final place of rest. It is, nevertheless, a matter of common knowledge that all interstate shipments eventually reach a terminal point, that is, a place where their interstate character and incident immunities from state interference and control are immediately and completely lost and where the shipment, by the same token, becomes immediately and completely responsive and liable to any nondiscriminatory local laws appropriately relating to it. Such is true of any livestock coming into this state from without its boundaries by any means of transport. *When we use the term 'final place of rest', we have no reference to that type of temporary rest or momentary interruption in the continued flow of commerce which sometimes give a commodity a temporary situs sufficient to make it liable to assessment for taxation under local tax laws.*" (Italics ours.)

It is manifest that every question now raised by the plaintiff was fully answered in our original opinion. We there held that the interstate transportation of the out-of-state cattle involved in that case did not come to an end or its final place of rest at the Stock Yards; it only came to an end when the cattle reached the slaughtering pens of Swift & Co. and Armour & Co.

██ It is well-established that public stockyards are not considered places of rest or final destination of interstate shipments of cattle, and neither do sales in the stockyards interrupt the continuity of interstate commerce. It is obvious that stockyards are neither consumers nor distributors of livestock. They merely provide facilities for temporary care and disposition of livestock by well-established commercial methods. They are not livestock homes; they are merely "livestock hotels". As indicated, they are in no sense a

place of final destination, nor are they intended as such by those engaged in interstate commerce. As Mr. Justice WARNER so clearly pointed out in our former opinion, interstate commerce is a practical conception to be determined upon consideration of established facts and known commercial methods.

In *Stafford v. Wallace,* 258 US 495, 515, 66 L ed 735, 42 SC 397, 23 ALR 229, Mr. Chief Justice Taft, speaking for the court, said:

> "The stockyards are not a place of rest or final destination. Thousands of head of live stock arrive daily by carload and trainload lots, and must be promptly sold and disposed of and moved out to give place to the constantly flowing traffic that presses behind. The stockyards are but a throat through which the current flows, and the transactions which occur therein are only incidents to this current from the West to the East, and from one State to another. Such transactions can not be separated from the movement to which they contribute and necessarily take on its character. The commission men are essential in making the sales without which the flow of the current would be obstructed, and this, whether they are made to packers or dealers. The dealers are essential to the sales to the stock farmers and feeders. The sales are not in this aspect merely local transactions. They create a local change of title, it is true, but they do not stop the flow; they merely change the private interests in the subject of the current, not interfering with, but, on the contrary, being indispensable to its continuity."

In *Swift and Company v. United States,* 196 US 375, 398, 49 L ed 518, 25 SC 276, Mr. Justice Holmes wrote:

> "* * * When cattle are sent for sale from a place in one State, with the expectation that they

will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce. * * *

"It should be added that the cattle in the stock yard are not at rest * * *."

In *Schecter Corp. v. United States,* 295 US 495, 542, 79 L ed 1570, 55 SC 837, 97 ALR 947, the record disclosed that defendants ordinarily purchased their live poultry from commission men at the West Washington Market in New York City or at the railroad terminals serving the city, but occasionally they purchased from commission men in Philadelphia. They bought poultry for slaughter and resale. After the poultry was trucked to their slaughterhouse markets in Brooklyn, it was there sold, usually within 24 hours, to retail poultry dealers and butchers who sold directly to consumers. In discussing defendants' transactions in connection with interstate commerce, the Supreme Court said:

"* * * When defendants had made their purchases, whether at the West Washington Market in New York City or at the railroad terminals serving the City, or elsewhere, the poultry was trucked to their slaughterhouses in Brooklyn for local disposition. *The interstate transactions in relation to that poultry then ended.*" (Italics ours.)

■ The shipment of the 1464 head of cattle involved in this case in interstate transportation did not terminate or come to its final place of rest within the state until the cattle had reached defendant's packing plant in Salem. Therefore, the cattle were not subject to

brand inspection; they were not a part of any shipment originating within the state of Oregon.

The view we take of this case renders unnecessary a consideration of the constitutional questions presented on this appeal.

The judgment is affirmed.