392 P.2d 191

**ORE–IDA POTATO PRODUCTS, INC., a corporation, Plaintiff-Appellant,**

v.

**UNITED PACIFIC INSURANCE COMPANY, a corporation, Defendant-Respondent.**

No. 9267.

Supreme Court of Idaho.

April 30, 1964.

188

Elam, Burke, Jeppesen & Evans, Boise, Gallagher & Galey, Ontario, Or., for appellant.

Frank F. Kibler, Nampa, Wayne P. Fuller, Caldwell, for respondent.

SMITH, Justice.

This is an appeal from a judgment dismissing an action brought by appellant (plaintiff) to recover on a statutory farm produce dealer's bond, I.C. § 22–1304, issued by respondent (defendant) to Black Canyon Produce, Inc., hereinafter referred to as Black Canyon, a farm produce dealer, broker and commission merchant formerly doing business at Caldwell, Idaho.

Appellant, during the time of the present action, was engaged in growing, processing, buying and selling potatoes. Appellant sold and delivered bulk potatoes to Black Canyon, as follows:

On December 31, 1957, a railroad car-load, f. o. b. Trout, Idaho, shipped from Trout, Idaho, to "Black Canyon Produce, Kansas City, Mo." (Pl. Exhibit 3).

On January 11, 1958, a truck load, f. o. b. Ontario, Oregon, shipped from Ontario, Oregon, to "Black Canyon Produce, Kansas City, Kansas." (Pl. Exhibit 4).

On January 25, 1958, a truck load, f. o. b. Ontario, Oregon, shipped from Ontario, Oregon, sold to "Black Canyon Produce, Box 8, Caldwell, Idaho," without indicating the place of destination. (Pl. Exhibit 5).

The sale price of the potatoes totalled $2,782. Terms of payment were "Net Cash vs. Invoice," shown on the invoices.

In compliance with the law governing dealers in farm produce, I.C. Title 22, ch. 13, Black Canyon filed with the Commissioner of Agriculture of the State of Idaho, a $2,500 surety bond issued to respondent. I.C. § 22–1304. Under the bond, respondent bound itself jointly and severally "to the State of Idaho, and in favor of every consignor of farm products to said principal [Black Canyon], in the sum of Twenty-five Hundred Dollars ($2500.00) * * * for the license period commencing May 31, 1957, and ending May 30, 1958 * *." The language of the bond does not specify in what manner a consignor's claims were to be settled. I.C. § 22–1305 provides for payment of farm products, if not otherwise

stated, "within thirty days from the delivery or taking possession of such farm products".

On February 13, 1958, negotiations between appellant's president and officers of Black Canyon resulted in Black Canyon's execution and delivery of a promissory note in the principal sum of $2,782, bearing interest at the rate of 6% per annum, to appellant at its office in Ontario. Black Canyon promised to pay the note in weekly installments of $50.00 "with final balance to be paid not later than 8/31/58." Endorsements on the back of the note show payments of $50 each on Februray 24, and March 3, 1958, and a credit of $295.51 on March 7, 1958, leaving a balance of $2,-386.49.

Respondent never received notice, either actual or constructive, of the above mentioned negotiations, the execution and delivery of the promissory note, nor of the payments and endorsements thereon.

No further payments on the note being made by Black Canyon, appellant commenced this action May 21, 1959, seeking recovery from respondent of $2,386.49, as the alleged balance owed by Black Canyon on the potato account, plus attorneys' fees.

Respondent by its answer admitted that Black Canyon was a produce dealer during the times mentioned in the complaint and that respondent had furnished Black Canyon's produce dealers bond, on file with the Commissioner of Agriculture, but denied any liability under the bond for payment of the debt and attorneys' fees. By affirmative defense, in further denial of liability, respondent alleged the execution and delivery of Black Canyon's promissory note to appellant, and payments made on the amount thereof; that the note evidences Black Canyon's valid obligation; that appellant is the owner and holder of the note; that all claims of appellant against Black Canyon became merged in the note, and that respondent's bond did not extend to nor guarantee payment of the note.

The trial court, after a trial without a jury, made findings of fact and conclusions of law, followed by entry of judgment dismissing the action. This appeal resulted.

Appellant by its assignments of error contends that the trial court erred in finding that appellant accepted the promissory note of Black Canyon in payment of its debt owed to appellant "and that a novation transpired." Since appellant thereby questions the sufficiency of the evidence to support the finding, we refer to the testimony of officers of appellant and Black Canyon.

Mr. Call, appellant's secretary, testified on cross-examination:

"Q. Now, calling your attention to Defendant's Exhibit # A [the promissory note] admitted into evidence Mr.

Call, on the back of it there is a notation of payment endorsed, do you know who endorsed those payments?

"A. Yes sir, I did.

"Q. And what is the date and amount of the payments shown on the note?

"A. February 24th for $50.00; March 3rd $50.00 and March 7th endorsed credit memo of $295.51.

\* \* \* \* \* \*

"Q. And you also have them as credited on the accounts receivable ledger?

"A. \* \* \* yes.

"Q. Now, what explanation do you have for showing them in both places?

"A. The note was simply evidence of indebtedness. The account was an open accounts receivable, \* \* \*

"Q. \* \* \* even though you get a note on a transaction \* \* \*, you continue to carry the item on your accounts receivable?

"A. We don't consider the thing consummated by a note. It was in accounts receivable.

\* \* \* \* \* \*

"Q. Now, who negotiated the obtaining of this exhibit #A from this company Mr. Call?

"A. Mr. Grigg, President of our company.

\* \* \* \* \* \*

"Q. And he brought the note and turned it over to you as secretary-treasurer of the company?

"A. That is right.

\* \* \* \* \* \*

"Q. \* \* \* in your bookkeeping system, do you carry a notes receivable ledger?

"A. We do.

"Q. And this note was never put in this, is that right?

"A. It was not."

Mr. Huizinga, Black Canyon's President, called by respondent, testified on direct examination:

"Q. At the time of giving that note \* \* \* what was the purpose of giving it to them [Ore-Ida]?

"A. To make payments of the obligation of Black Canyon to Ore-Ida.

"Q. In other words, you were settling your account with the note, is that right?

"A. Yes sir."

Additional testimony of those same witnesses support the trial court's finding that respondent had no notice of the negotiations between Ore-Ida and Black Canyon

relative to the execution and delivery of the promissory note. All of those transactions were for the purpose of "trying to work out a way with Black Canyon where they could pay that indebtedness."

■ ■ The testimony of appellant's officer, Mr. Call, emphasizes that appellant did not, and in no way intended to, accept Black Canyon's promissory note as payment of its obligation. The testimony of respondent's witness, Mr. Huizinga, to the effect that the note was executed "to make payments of the obligation of Black Canyon to Ore-Ida" and to settle the account is insufficient, without more, to sustain the trial court's finding that these acts constituted a novation between the parties and discharged respondent's obligation in the premises. A novation requires the assent of all the parties thereto; the original debtor must be fully discharged and the debt as to him extinguished. First National Bank in Evanston v. Sims, 78 Idaho 286, 301 P.2d 1103 (1956); Exchange Lumber & Mfg. Co. v. Thomas, 71 Idaho 391, 233 P.2d 406 (1951).

We are therefore constrained to the view that the evidence is insufficient to support the finding that the parties intended the promissory note to be in satisfaction of Black Canyon's debts owed to appellant and that a novation resulted. Appellant's assignments in the premises are meritorious.

Appellant next contends that respondent's bond covered the two Oregon transactions. In that connection appellant assigns as error the trial court's finding that those transactions as regards two carloads of potatoes (Exhibits 4 and 5), including the sale and delivery thereof "were fully, wholly and entirely consummated between the parties in the State of Oregon, and that said transactions did not occur in the State of Idaho", but in Ontario, Oregon, on January 11 and 25, 1958, (Findings 6 and 7), in that the finding is "contrary to the law and the evidence."

Appellant also assigns as error the trial court's finding that "the State of Idaho had no jurisdiction or authority to regulate transactions taking place in another state * * * for the reason that said finding is contrary to the law."

■ Appellant does not argue the question of insufficiency of the evidence to support the finding that the two so-called Oregon transactions were fully, wholly and entirely consummated in the State of Oregon, thus precluding review on appeal in the premises. Supreme Court Rule 41; Batchelder v. City of Coeur d'Alene, 85 Idaho 90, 375 P.2d 1001 (1962); Jewett v. Williams, 84 Idaho 93, 369 P.2d 590 (1962).

. Appellant argues as a matter of law that I.C. Title 22, ch. 13, applies to all transactions of a produce dealer licensed and

bonded in this state. Appellant points to I.C. § 22–1301 as defining a consignor, as "any person who ships or delivers to any * * * dealer any farm products for handling, sale, or resale"; and as defining a dealer as one who obtains from the producer possession of farm products "without paying * * * the full agreed price." Appellant also points to I.C. § 22–1304, which requires a produce dealer to supply the bond for the benefit of "any and all consignors having any cause of action against the broker, dealer * * * arising out of a breach of contract * * * of such broker, dealer * * * with a consignor"; also to I.C. § 22–1305, which requires "every dealer" to pay for farm products delivered to him within 30 days from delivery.

Appellant argues in effect that an extraterritorial effect of I.C. Title 22, ch. 13 must attain by implication in view of the terminology used in the various sections of the statute, such as, any person (which includes a corporation, I.C. § 22–1301), any dealer or broker, every dealer, and any and all consignors, which would include all transactions including sale and delivery of a produce dealer licensed and bonded in this State, though consummated wholly and entirely outside the State of Idaho,—in this cause, in the State of Oregon.

An examination of this Act, I.C. Title 22, ch. 13, does not disclose any express phraseology designed to extend to transactions consummated "fully, wholly and entirely," (as so found by the trial court) in a state foreign to Idaho.

Appellant cannot be permitted the extraterritorial interpretation of I.C. Title 22, ch. 13, which it seeks. The bond furnished by a produce dealer under the Act must be measured by the law of Idaho under which it was written, and particularly I.C. § 22–1304. Statutes are intended to apply and be confined in their operation to persons, property and rights which are within the territorial jurisdiction of the law-making power. The Act does not expressly provide for extraterritorial application. In the absence of any extraterritorial phraseology contained in such Act, it cannot be construed to have an extraterritorial effect, on the theory that the legislature so intended.

The question was first answered by the Court in Walbridge v. Robinson, 22 Idaho 236, 125 P. 812, 43 L.R.A.,N.S., 240 (1912). The issue was whether under a statutory permit, water could be diverted from Idaho for irrigation use in Montana, in the absence of express legislation to that effect. Appellant Robinson, the state engineer, contended that, in the absence of a positive statute authorizing or conferring such a right, "the right does not exist, and that no presumption arises that the state by its silence intends to permit the diversion

and use of its waters beyond its jurisdiction." Respondent Walbridge, on the other hand, contended that the carrying of water from Idaho to a foreign state, to be applied to a beneficial use, was not in violation of any provision of the Constitution nor of the statute. In ruling upon the issue this Court stated:

"These propositions call for a consideration of the nature of state legislation, both as to the class of subjects to which it applies and the jurisdictional limits in which it can be executed. Black on Interpretation of Laws, p. 91, says: *'Prima facie*, every statute is confined in its operation to the persons, property, rights, or contracts, which are within the territorial jurisdiction of the Legislature which enacted it. The presumption is always against any intention to attempt giving to the act any exterritorial operation and effect.' Endlich on Interpretation of Statutes, p. 233, announces the same principle. Cooley on Constitutional Limitations (7th Ed.) p. 176, says: 'The legislative authority of every state must spend its force within the territorial limits of the state.' The Supreme Court of the United States, in Hilton v. Guyot, 159 U.S. 113, 16 Sup.Ct. 139, 40 L.Ed. 95, says: 'No law has any effect, of its own force, beyond the limits of the sover-

eignty from which its authority is derived.'" 22 Idaho 246, 125 P. 815.

This Court in the case of In re Duncan's Death, 83 Idaho 254, 261, 360 P.2d 987, 991 (1961), continued to adhere to the rule announced in Walbridge v. Robinson, supra, stating:

"* * * One who claims the benefit of such law, for either person or property, beyond the territorial jurisdiction of the law-making power must rest such claim upon a statute granting such extraterritorial right."

In 15 C.J.S. Conflict of Laws § 3, p. 833 (1939), the "rule, universally reiterated," is stated:

"* * * no law, statute, or otherwise has any force or effect of its own beyond the limits of the sovereignty from which its authority is derived."

See also Mason v. Jansen, 45 Idaho 354, 263 P. 484 (1927); Canadian Birkbeck Inv. & Savings Co. v. Williamson, 32 Idaho 624, 186 P. 916 (1920); Union Pac. R. Co. v. Anderson, 167 Or. 687, 120 P.2d 578 (1941) which held that a law enacted by Oregon's legislature necessarily applies only to a subject within its jurisdiction, and the words, "in Oregon", if not expressed, are necessarily implied. In re Ray's Estate, 74 Wyo. 317, 287 P.2d 629 (1955).

Swift & Company v. Peterson, 192 Or. 97, 233 P.2d 216 (1951), held that the

only livestock amenable to Oregon's statute providing for identification of livestock and the prevention of livestock theft, Ore.Laws 1949, ch. 193, § 1 et seq.; O.C. L.A. § 6–602, applied to livestock which were a part of shipments originating in Oregon. The Oregon statute contained the provision, " 'Livestock' means *all* cattle, horses, mules and asses" (emphasis supplied). It was asserted that "all" was therein used "in its most inclusive sense and thereby evidences the legislative intent to extend the Act to *all* livestock coming into Oregon from other states even before they have ceased to be a part of the flow of interstate commerce." In ruling that the word, "all", in the definition of the word, "livestock", meant only livestock which are a part of shipments originating in Oregon, the Court adopted the language of 50 Am.Jur., Statutes, § 487 at 511 (1944), well supported by eminent authority, limiting general words, such as "any" or "all", in their operation to the territorial jurisdiction of the law-making power, as follows:

" * * * a statute is prima facie operative only as to persons or things within the territorial jurisdiction of the law-making power which enacted it. These rules apply to statutes using general words, such as 'any' or 'all,' in describing the persons or acts to which the statute applies. They are particularly applicable where the statute would be declared invalid if given an interpretation resulting in its extraterritorial operation."

The Court in the Swift & Company v. Peterson case in discussion of the proposition that the Oregon legislature had no intention to reach shipments *originating outside the state* ruled as follows:

"No legislation is presumed to be intended to operate outside of the jurisdiction of the state enacting it. In fact, a contrary presumption prevails and statutes are generally so construed. 50 Am.Jur., Statutes, 510, § 487; Sandberg v. McDonald, 248 U.S. 185, 39 S.Ct. 84, 195, 63 L.Ed. 200; State v. Lancashire Fire Ins. Co., supra, 66 Ark. 466, 51 S.W. 633. The legislature was not concerned with the protection of owners of livestock in other states, nor could it legally have done so, for the exercise of the police power is limited to the protection of the people and property of the state of the enactment. Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182."

See also Peterson v. Valley Packing Co., 202 Or. 489, 276 P.2d 403 (1954); United States v. Katz et al, 271 U.S. 354, 362, 46 S.Ct. 513, 70 L.Ed. 986 (1926); State v. Lancashire Fire Insurance Co., 66 Ark. 466, 51 S.W. 633, 45 L.R.A.,N.S., 348 (1899); State v. Peet, 80 Vt. 449, 68 A.

661, 14 L.R.A.,N.S., 677 (1908); 11 Am. Jur., Constitutional Law, § 100 at 734 (1937).

■ Under the record herein there is no merit to appellant's contention that I.C. Title 22, ch. 13, extended to the two carloads of potatoes, concerning which the court found that all transactions relating thereto "were fully, wholly, and entirely consummated between the parties in the State of Oregon, * * * and that said two (2) transactions did not occur within the State of Idaho."

■ The court found that all transactions relating to the third carload of potatoes sold and delivered by appellant to Black Canyon were consummated within this state at Trout, Idaho, and the record sustains such finding. A cause of action accrued under the bond in favor of appellant upon Black Canyon's failure to pay for such shipment of potatoes within 30 days of consummation of the transaction of sale of such shipment. Whether recovery may be had therefor upon a new trial in the present action, must depend, however, upon the disposition of further questions of law to which we hereinafter refer which may depend upon factual situations developed from evidence adduced.

■ In the light of our disposition of this appeal by the granting of a new trial, I.C. § 1–205 admonishes us to determine questions of law which may be necessary for the final determination of the case.

*Did appellant's acceptance of the promissory note effect a material alteration of the suretyship contract?*

Smith v. Steele Motor Co., 53 Idaho 238, 22 P.2d 1070 (1933), involved a contract to guarantee payment of certain promissory notes, "for value received" by the guarantors from the principal. This Court adopted the "restatement of the common and elementary principle of law," Driscoll v. Winters, 122 Cal. 65, 54 P. 387 (1898), "well set forth in statutory form in California Civil Code, § 2819, as follows:"

" 'A guarantor is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, without consent of the guarantor, the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended.' " 53 Idaho at 243, 22 P.2d at 1071.

This Court, in the Steele Motor Co. case, cited the earlier Idaho case of Frost v. Harbert, 20 Idaho 336, 118 P. 1095, 38 L.R.A., N.S., 875 (1911), in support of the proposition that ordinarily the cause of action accrues against the guarantor upon default of the principal; but, that where the parties to the original contract enter into a new and

different contract for payment of the original obligation, without notice to or knowledge of the guarantor, then the latter cannot be held liable on the contract of guaranty. In Frost v. Harbert, supra, this Court then stated: "The engagement of the surety is accessory to the agreement of the principal; and it is a general rule of law that whatever discharges the contract of the principal discharges also that of the surety." 20 Idaho at 341, 118 P. at 1096.

Brock v. Western National Indemnity Company, 132 Cal.App.2d 10, 281 P.2d 571 (1955), involved facts similar to the case at bar. In that case, defendant Indemnity Company issued a $5,000 statutory farm produce dealer's bond, as required by section 1300.1a of the California Agricultural Code, to Clara-Val Packing Company. Clara-Val's failure to pay for certain produce purchased resulted in complaints by various produce growers to the state director of agriculture. A meeting of representatives of the produce growers with the department of agriculture and officers of Clara-Val resulted in an agreement, whereby the growers withdrew their claims in favor of a plan proposed by Clara-Val for installment payment of its debts. The Indemnity Company was not a party to the agreement, nor did it ever consent to any of the negotiations and resulting plan between Clara-Val, the principal under the bond, and its creditors. Clara-Val's financial condition having become worse with time, it filed bankruptcy proceedings some two years after the Indemnity Company had cancelled its surety bond. The Indemnity Company rejected claims of the produce growers who then brought suit to recover on the surety bond. The California District Court of Appeal, First District, in reversing judgment for the produce growers said:

"* * * the fact that the Director may decide with the creditors that it is to their best interest to give more time to the principal to meet his obligations is in our opinion, the granting of an extension of time, which generally under the law of suretyship is considered a material alteration which discharges the surety. Braun v. Crew, 183 Cal. 728, 192 P. 531; Boteler v. Conway, 13 Cal.App.2d 79, 82, 56 P. 2d 587; Driscoll v. Winters, 122 Cal. 65, 66, 54 P. 387; sec. 2819, Civil Code. While in the case of Mortgage Guarantee Co. v. Chotiner, 8 Cal.2d 110, 122, 64 P.2d 138, 144, 108 A.L.R. 1080, the defense of extension of time is referred to as 'one of the more technical suretyship defenses', we find no case which has abrogated the use of this defense in this state.

"The general rule is that the liability of a surety accrues at the same time as that of the principal. And

a cause of action upon a bond conditioned to do a certain act accrues as soon as there is a default in performance. 23 Cal.Jur. 1049, § 42. The default in performance occurred here when there was a failure to pay 30 days after delivery. The creditor's cause of action arose then, for he could have then sued the processor at any time thereafter, * * *

"The agreement between the creditors and the debtor to grant an extension of time to the debtor to pay was a material alteration of the original agreement to pay which discharged appellant surety. * * *

* * * * * *

"It cannot be doubted that * * * an extension of time was granted to the debtor. Creditors who had filed complaints were asked to withdraw them at the meeting of March 22, 1948, and a plan for payment on installments was outlined by the attorney for the company to which the growers agreed. The surety was not a party to this agreement, and there is nothing in the record from which it can be inferred that it assented thereto." 281 P.2d at 575–576.

The more recent California cases of Mortgage Finance Corporation v. Howard, 210 Cal.App.2d 569, 26 Cal.Rptr. 917 (1962) and Bloom v. Bender, 48 Cal.2d 793, 313 P.2d 568 (1957) approve the holding in the Brock case, that an extension of time for payment of debts by a creditor to a principal is considered a material alteration of the suretyship contract and discharges the surety company.

In Annot., 74 A.L.R.2d 734 (1960), dealing with guarantyship contracts, it is discerned that the foregoing statements correctly express the law as it exists today. The annotation, at pages 736 and 737, shows an overwhelming weight of authority supporting the view that the act of the creditor in extending the time of payment by binding agreement, as by taking the debtor's promissory note payable at a time beyond that specified or contemplated by the guaranty contract, releases the guarantor completely or, at the very least, to the amount of the promissory note.

*Necessity of showing prejudice.*

The record before us indicates a material alteration of the suretyship contract. Restatement of Security, § 128, and an extension of time of payment, Restatement of Security, § 129(1), without either the actual or constructive knowledge or the consent of respondent. As a general rule, either a material alteration or an extension of time would discharge respondent's obligation under the surety contract. Restatement of Security, supra. Ap-

pellant contends, however, that these acts are not sufficient; that a compensated surety must show prejudice in order to be relieved of its obligation under the contract. The question raised is one of first impression in this jurisdiction.

Notwithstanding a material alteration of the suretyship contract, the weight of authority supports the view that a compensated surety must show prejudice or injury in order to be relieved of its obligation under the contract. The undertakings of compensated sureties are regarded as in the nature of insurance contracts and controlled by rules applicable thereto, rather than by rules applied to gratuitous sureties, which, under the doctrine of strictissimi juris, are regarded as favorites of the law. Gruman v. Sam Breedon Construction Co., 148 So.2d 759 (Fla.App.1963); Westinghouse Electric Corp. v. Mill & Elevator Co., 254 Iowa 874, 118 N.W.2d 528 (1962); Crane Supply Company v. American States Insurance Co., 310 F.2d 712 (6th Cir. 1962); Phoenix Assurance Co. of New York v. City of Buckner, Mo., 305 F.2d 54 (8th Cir. 1962); Old Colony Insurance Company v. City of Quitman, 352 S.W.2d 452 (Texas 1962); White v. Brown, 110 U.S.App.D.C. 232, 292 F.2d 725 (1961); Chapman v. Hoage, 296 U.S. 526, 56 S.Ct. 333, 80 L.Ed. 370 (1936); 72 C.J.S. Principal and Surety §§ 124c, d, 189 (1951); 50 Am.Jur., Suretyship, §§ 321, 322 (1944); Restatement of Security, § 129(2) (1941); Annot. 94 A. L.R. 876 (1935).

Bekins Moving & Storage Co. v. Maryland Cas. Co., 72 Idaho 493, 244 P.2d 1100 (1952) is a more recent decision than the two Idaho cases hereinbefore mentioned, Smith v. Steele Motor Co., supra, and Frost v. Harbert, supra, and involved a suit against a compensated surety on a building contractor's bond. The decision therein makes no mention of a need to show prejudice by the compensated surety, nor that a material alteration took place; but infers that if such alteration did occur, the surety's obligation under the bond would terminate. Be that as it may, this Court adheres to the great weight of authority and adopts the rule that in addition to showing material alteration, a compensated surety must show prejudice in order to be relieved of its obligations under the suretyship contract. Such rule is in harmony with the modern trend in this area of suretyship law.

A careful analysis of the trial record also indicates that the testimony elicited on the matter is also insufficient to show that respondent was prejudiced as a matter of law by the negotiations and subsequent acts between appellant and Black Canyon. Additional testimony of Mr. Huizinga supports this conclusion:

"Q. Mr. Huizinga, during the time of between January and August was your company in January 1958 in a pretty fair operating condition and did it worsen after that—what was the situation?

"A. I think the condition of the company in January was a little treacherous but I had no knowledge of it until we had a bookkeeper come in who * * * . brought a lot of things out that I * * * was unaware of.

"Q. And after that it continued to worsen or get worse, is that correct?

"A. Yes, due to the local jobbing deal and market.

* * * * * *

"Q. Did the company go into bankruptcy?

"A. No sir.

"Q. What happened—it is liquidated now isn't it?

"A. Yes.

"Q. Out of business?

"A. Yes.

"Q. * * * did you have a mortgage foreclosure and prorate with your creditors or what did you do?

"A. The property all went back; the property that were purchased * * just went back to the people that sold them to the Black Canyon Produce.

The machinery was covered in a bank mortgage and that was foreclosed.

* * * * * *

"Q. And did all of these transactions occur after this note was signed in February [1958]—this foreclosure and all of these things?

"A. I believe so.

* * * * * *

"Q. And * * * Black Canyon Produce has no assets at the present time does it?

"A. No sir."

In its brief, respondent discusses the steps it might have taken to protect its interests, had it been notified of the extension of time granted Black Canyon by appellant. Respondent's discussion, while persuasive, is mere argument, and cannot be considered on appeal. Hansen v. Devaney, 82 Idaho 488, 356 P.2d 57 (1960); Lanning v. Sprague, 71 Idaho 138, 227 P.2d 347 (1951).

The judgment is reversed and the cause remanded for a new trial.

Costs to appellant.

McQUADE and TAYLOR, JJ., concur.

McFADDEN, Justice (concurring in part, and dissenting in part).

I concur in the portion of the majority opinion dealing with the issue of whether appellant's acceptance of the promissory note affected a material alteration of the suretyship contract, and also concur in that portion of the opinion pertaining to the necessity of a compensated surety showing prejudice. I also concur that the cause should be remanded for a new trial. However, I dissent from that portion of the opinion determining that no recovery could be had for the two carloads (truckloads) of potatoes represented by Exhibits 4 and 5.

The question presented is whether appellant Ore-Ida Potato Products, Inc., a corporation qualified to do business in Idaho, as the consignor, may sue upon a $2,500 bond issued Black Canyon Produce, Inc., an Idaho corporation, which bond was posted by respondent in order that Black Canyon could do business as an Idaho farm produce dealer.

It is the general rule that in the absence of limitations or restrictions contained in the surety contract, the liability of the surety is co-extensive with that of the principal. State Athletic Comm'n. v. Massachusetts Bonding & Ins. Co., 46 Cal.App. 2d 823, 117 P.2d 75 (1941); Bloom v. Bender, 48 Cal.2d 793, 313 P.2d 568, 574 (1957); 72 C.J.S. Principal & Surety § 92, p. 572 n. 48. This being a statutory bond, however, in order to determine the extent

of the surety's liability, its terms must be construed in light of the statute. Lebrecht v. Union Indemnity Co., 53 Idaho 228, 22 P.2d 1066, 89 A.L.R. 640; Morro Palisades Co. v. Hartford Acc. & Indem. Co., 52 Cal.2d 397, 340 P.2d 628, 630 (1959). It is the position of the majority opinion that since the statute does not expressly provide for extra-territorial application, the statutory bond which does not purport to be more inclusive in its coverage than the minimum requirements of the statute, does not cover transactions such as the sale and delivery to Black Canyon of the potatoes represented by Exhibits 4 and 5.

Once the consignor has shown occurrence of the contingency upon which the surety is liable, the burden of showing a restriction in, or an exception to that liability (in this case the limitations of the statute) is upon the surety. Zach v. Pond, 50 Idaho 685, 687, 299 P. 666. The trial court found that the transactions involved in the exhibits 4 and 5, "* * * were fully, wholly and entirely consummated between the parties in the State of Oregon, and that said transactions did not occur in the State of Idaho, * * *". It is my conclusion that this finding is not wholly sustained by the evidence, for the record is devoid of any evidence as to how or where the initial offer and acceptance between the parties was made, or whether the transaction arose by reason of Black

Canyon Produce Inc's., status as an Idaho farm produce dealer. If such initial offer, or its acceptance, occurred in Idaho, or from the Idaho offices of the parties to the contract, the transaction would have been one contemplated by the statute and covered by the bond, and thus there is no extra-territorial application of the statute. Pyrke v. Standard Accident Insurance Co., 144 Misc. 53, 258 N.Y.S. 869, aff'd sub nom. Baldwin v. Standard Accident Ins. Co., 237 App.Div. 334, 261 N.Y.S. 507, aff'd 262 N.Y. 575, 188 N.E. 71. See also: Wickham v. Champlain Creameries, Inc., (Sup.Ct.N.Y.1963) 245 N.Y.S.2d 688.

Even assuming that there was sufficient evidence to sustain the court's finding that these transactions were wholly consummated in Oregon, the surety still has the affirmative of showing that this bond did not cover the out of state transactions. Zach v. Pond, 50 Idaho 685, 687, 299 P. 666. This the surety failed to do. If it had desired to raise this as a defense it should have timely raised this issue as an affirmative defense.

It is my conclusion that the transactions represented by exhibits 4 and 5, were covered by the bond, which contained no exceptions beyond those fixed by the statute itself.

KNUDSON, C. J., concurs.