[L. A. No. 24508. In Bank. July 2, 1957.]

## SAMUEL S. BLOOM, Respondent, v. BESS BENDER, Appellant.

Simon, Brown & Arnold and Merrill Brown for Appellant.

Milton D. Klein and Gerald A. Margolis for Respondent.

Morrison, Foerster, Holloway, Shuman & Clark, J. F. Shuman and Howard M. Downs as Amici Curiae on behalf of Respondent.

SCHAUER, J.—From a judgment for plaintiff in his action to recover on a continuing guarantee, defendant appeals, claiming that, for reasons hereinafter specified, her liability as guarantor had terminated. We have concluded that, under the provisions of the agreement and the applicable principles of the law of suretyship,[1] defendant's contentions are not

---

[1] In 1939, section 2787 of the Civil Code was amended to provide as follows: ''The distinction between sureties and guarantors is hereby abolished. The terms and their derivatives, wherever used in this code or in any other statute or law of this State now in force or hereafter enacted, shall have the same meaning, as hereafter in this section defined. A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor. Guaranties of collection and continuing guaranties are forms of suretyship obligations, and except in so far as necessary in order to give effect to provisions specially relating thereto, shall be subject to all provisions of law relating to suretyships in general.'' Under this section, even though the agreement in question is denominated a guarantee, the general rules of suretyship govern, and the terms ''surety'' and ''guarantor'' as used hereinafter are equally applicable to defendant.

supportable, and the judgment for plaintiff should therefore be affirmed.

Stipulated facts are as follows:

On April 18, 1947, defendant executed a guarantee addressed to Crompton-Richmond Company, Inc. (hereinafter referred to as Company). This agreement, reduced to its material terms, provides as follows:

"For and in consideration of . . . One Dollar . . . and . . . your extending credit . . . to Midwest Sportswear Manufacturing Co. Inc. [hereinafter termed Midwest] . . . the undersigned . . . do[es] hereby guarantee unto you, unconditionally, the prompt payment or settlement at maturity of any and all amounts owing or that may be hereafter owing to you by . . . [Midwest] on the terms as stated on the bill or bills rendered by you . . . to the extent of Unlimited Dollars ($_____), on all purchases. . . .

"The liability hereby assumed shall not be affected by any forbearance by you, or by the giving of any extension of time or by any other modification of any sale, contract, account or obligation or instrument in connection therewith, or by the acceptance of any settlement or composition offered by . . . [Midwest], either in liquidation, readjustment, receivership, bankruptcy or otherwise.

"It being also understood and agreed that you are not required to give notices to the undersigned of the different purchases, orders or contracts, nor the amounts thereof, nor of any failure or omission on the part of . . . [Midwest] to meet all payments or obligations as they mature, and that immediately upon a notice of default in payment or settlement of any bill or bills by . . . [Midwest] the undersigned . . . will pay to you without question, the amount of such bill or bills . . .

"This is to be construed as a continuing and binding guarantee until revoked by me in writing . . ."

During the period from April 18, 1947, to November 30, 1949, Midwest became indebted to Company on an open book account for goods purchased in the amount of $5,031.03. Thereafter, on April 16, 1951, Company signed a document entitled "Release" pursuant to a "general assignment for the benefit of its creditors" entered into by Midwest. By this document Company agreed to "accept its prorata and proportionate dividend, if any, under said assignment . . . as an accord and satisfaction of and release, discharge and acquittance of any and all claims, demands, obligations and liabili-

ties existing in favor of . . . [Company] as an extending creditor, as against . . . [Midwest]." Under the composition agreement the prorata dividend received by Company was $321.99, which sum was applied against the total amount due, leaving an unpaid balance of $4,709.04.

On June 10, 1954, plaintiff, as assignee of Company, commenced the present action on the guarantee to recover such unpaid balance. The trial court found that at the time of the filing of the action, the statute of limitations (Code Civ. Proc., § 337) barred any cause of action by plaintiff or Company against Midwest, but that defendant was outside of California from on or about October 1, 1951, until on or about November 1, 1952, during which time the statute of limitations on her guarantee was tolled. The court also determined that the release executed by Company did not discharge defendant, and that her agreement was a continuing guarantee.

The trial court concluded that even though the statute of limitations had run against Midwest, the obligation of defendant "is a separate and distinct contract" on which the statute of limitations had not run and that defendant guarantor was not exonerated by the release of the principal debtor since she had expressly consented to such release. Judgment in favor of plaintiff for the full amount claimed was entered against defendant and from this judgment she appeals.

Five grounds are specified in support of defendant's contention that the judgment should be reversed: (1) the running of the statute of limitations against the obligation of the principal debtor terminated the obligation of the guarantor; (2) the obligation of the guarantor is itself barred by the statute of limitations; (3) the Company failed to give notice to the guarantor of Midwest's default in payment as assertedly required by the agreement; (4) the release of the principal debtor by Company terminated the guarantee; and (5) the obligation of the guarantor, as determined by the trial court, exceeds the obligation of the principal and, hence, transgresses the provisions of section 2809 of the Civil Code. These contentions will be considered seriatim.

■ *Running of Statute of Limitations against Principal as Barring Action against Surety.* In 1939, by amendment to section 2787 of the Civil Code, the Legislature abolished the distinction between sureties and guarantors. Prior to that time it had been held in California that the bar of the statute of limitations against an action on the obligation of a principal

foreclosed recovery from his guarantor (*Anderson* v. *Shaffer* (1929), 98 Cal.App. 457, 460 [3] [277 P. 185] ; see also *Santa Ana Sugar Co.* v. *Smith* (1931), 116 Cal.App. 422, 431 [2 P.2d 866]), but did not prevent recovery from his surety (*Gaffigan* v. *Lawton* (1934), 1 Cal.2d 722, 723 [3] [37 P.2d 79] ; *Gill* v. *Johnson* (1935), 8 Cal.App.2d 369, 372 [3] [48 P.2d 139]). Section 2787, as amended in 1939, provides in material part that "The distinction between sureties and guarantors is hereby abolished. . . . Guaranties of collection and continuing guaranties are forms of suretyship obligations, and except in so far as necessary in order to give effect to provisions specially relating thereto, shall be subject to all provisions of law relating to suretyships in general."

▮ Although there is a substantial conflict of authority in other jurisdictions as to whether a surety is discharged when the cause of action against his principal is barred by the statute of limitations (see 72 C.J.S. 692, § 233), this court has recognized that "the more reasonable and logical rule, supported by a number of cases, is that the obligation of the surety remains notwithstanding the fact that the statute of limitations has run on the obligation of the principal. [Citations.]" (*Gaffigan* v. *Lawton* (1934), *supra*, 1 Cal.2d 722, 723-724 [3] ; see also *Gill* v. *Johnson* (1935), *supra*, 8 Cal. App.2d 369, 372 [3] ; Rest., Security, § 120, comment a, and § 130, comment a on subsection (1) and illustration 2.)

▮ Thus, in California, the obligation of defendant on her continuing guarantee is not barred merely because the statute of limitations had run against the obligation of the principal debtor, Midwest.

*Statute of Limitations on the Guarantee.* The debt of Midwest to Company for goods purchased accrued between April 18, 1947, and November 30, 1949. There is nothing in the record to establish the exact date of purchase of any of the goods which comprise the source of the total debt. The instant action was commenced on June 10, 1954, more than four years after the date of the last purchase, and defendant relies on the four-year statute of limitations (Code Civ. Proc., § 337) as barring this action on the guarantee. However, defendant does not challenge the trial court's determination that the running of the statute was tolled during a thirteen-month period when defendant was found to have been absent from the state. (Code Civ. Proc., § 351.) As a consequence, plaintiff's action against defendant is not barred unless it accrued prior to May 11, 1949.

Defendant argues that at least some of the goods in question were purchased prior to May 11, 1949, and that the action as to those items is therefore barred. It is contended that since it cannot be determined what portion of the total debt is attributable to the items for which recovery is barred, the entire judgment must be reversed for inability to determine whether the evidence supports the judgment with reference to the purchases after May 11, 1949. To uphold this argument defendant cites *Williams* v. *Dougan* (1950), 100 Cal. App.2d 421, 427 [1] [233 P.2d 631]. But the present situation, unlike the Williams case, does not involve the problem of determining the value of the separate items which make up the account. The parties here stipulated, and the trial court found, that the indebtedness in question was incurred on an "open book account." Section 337, subdivision 2, of the Code of Civil Procedure provides that the statute of limitations on an action to recover a balance due on an open account based on more than one item begins to run from the date of the last item comprising the account. ■ The general rule is that the liability of a surety (in the absence of a different contractual provision) accrues at the same time as that of the principal, or upon default of the principal. (*Brock* v. *Western Nat. Indem. Co.* (1955), 132 Cal.App.2d 10, 16 [2] [281 P.2d 571]; 23 Cal.Jur. 1049, § 42; 72 C.J.S. 577, § 99; Civ. Code, § 2807.) ■ The terms of the agreement sued on here do not relieve defendant of the burden of the general rule. Since the cause of action against the principal accrued on the date of the last entry in the open account, and as that date was subsequent to May 11, 1949, it follows that the cause of action against the surety also accrued after that date and that the period of limitations on the action against defendant had not run when the complaint was filed.

■ *Notice of Default of the Principal.* Defendant's contention that notice to her of Midwest's default in payment was a condition precedent to liability is without merit. Neither the law nor the subject agreement requires such notice. Section 2807 of the Civil Code provides that "A surety who has assumed liability for payment or performance is liable to the creditor immediately upon the default of the principal, and without demand or notice." Defendant's agreement specifically provides that notice was not required of the several purchases, or of the failure to meet payments as they matured, and that "immediately upon a notice of default in the payment . . . of any bill" defendant would pay the amount due.

The bringing of the present action, with its attendant process, constituted sufficient notice of default.

■ *Effect of Release of the Principal.* Defendant argues that when Company released Midwest from further liability pursuant to the composition of creditors, the obligations of the surety to Company were likewise terminated. Defendant relies on the established rule that "where the principal is discharged the surety likewise escapes liability." (*Goatman v. Pacific Ready-Cut Homes, Inc.* (1931), 112 Cal.App. 397, 402 [297 P. 68].) But it is equally settled that "A surety is not exonerated from liability by a change in the contract between the principal and the creditor which is made with his consent." (*Michelin Tire Co.* v. *Bentel* (1920), 184 Cal. 315, 323 [3] [193 P. 770].) ■ Correspondingly, a surety is not discharged by release of the principal where "the surety consents to remain liable notwithstanding the release." (Rest., Security, § 122; see also 72 C.J.S. 686, § 223; Spencer on Suretyship (1913), p. 337, § 240.)

The above mentioned general rule and its exception in the case of consent by the surety are recognized in section 2819 of the Civil Code. That section provides that "A surety is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, *without the consent of the surety* the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended." (Italics added.) ■ The logical corollary to this statute is the exception above noted; i.e., where the surety consents to an alteration of the original obligation of the principal, or the impairment or suspension of any of the creditor's rights or remedies against the principal, the surety is not exonerated.

Section 2819 of the Civil Code was first enacted in 1872 in terms practically identical with the present statute as above quoted. As so enacted, section 2819 represented a codification of the existing common law on the subject. (See Civ. Code, § 2819 (1872), Code Commissioners' Notes.) The rule that consent of the surety to the release of the principal prevents such release from also discharging the surety was early recognized by the English courts (see *Cowper* v. *Smith* (1838), 4 M. & W. 519, 522; *Union Bank of Manchester* v. *Beech* (1865), 3 H. & C. 672, 676), and has consistently been followed by the American courts faced with the problem (see *Osgood* v. *Miller* (1877), 67 Me. 174, 176;

*School Dist. No. 37* v. *Aetna Accident & Liability Co.* (1921, Mo.App.), 234 S.W. 1017, 1019 [1]; *Fellows Box Co.* v. *Mills* (1933), 86 N.H. 267 [167 A. 153, 154]; *Haddad* v. *Western Contracting Corp.* (1946, N.D. W.Va.), 71 F.Supp. 212, 223 [11]). ▆ While no California case has been found dealing with the precise problem here involved, it is clear that the release of a debtor following a composition of creditors is an alteration of the original obligation of the principal within the contemplation of section 2819, and that, under that statute, where such alteration is consented to by the surety, the release of the principal does not exonerate the surety. ▆ Moreover, if effective consent to the change in the obligation of the principal will prevent the otherwise resultant discharge of the surety, such consent may be given in advance of the alteration of the principal's obligation as well as at or after the time of such act. (See 72 C.J.S. 607, § 124e, 644-645, § 158, and cases cited therein; see also *School Dist No. 37* v. *Aetna Accident & Liability Co.* (1921, Mo.App.), *supra,* 234 S.W. 1017; *McMullen* v. *United States* (1909, 9th Cir.), 167 Fed. 460; *Cowper* v. *Smith* (1838), *supra,* 4 M. & W. 519.) The guarantee agreement here in question specifically provides that the liability of the guarantor "shall not be affected by . . . the acceptance of any settlement or composition offered by . . . [Midwest], either in liquidation, readjustment, receivership, bankruptcy or otherwise." The above quoted provision plainly gives advance consent to the release of Midwest by means of an arrangement such as the composition agreement which was executed.

It follows from the foregoing discussion that the release of Midwest did not operate to discharge defendant as guarantor unless such discharge is effected by some overriding rule of law.

▆ *Effect of Section 2809 of the Civil Code.* Defendant insists that such overriding rule of law exists in section 2809 of the Civil Code, which provides that "The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation." It is argued that under the quoted specifications a surety contract wherein the surety agrees to remain liable even though the principal is released is a contract which imposes greater obligations on the surety than on the principal, and in such a case the surety's obligations must perforce be

reduced to an amount not exceeding those of the principal. This contention also is without merit.

To begin with, defendant's argument would logically require that under section 2809 every surety contract be unenforceable to the extent that it contemplates continuing liability of the surety after termination of the liability of the principal. ■ It is, however, the general rule that a surety is not discharged when the liability of his principal is extinguished by operation of law. (Civ. Code, § 2825; see also Civ. Code, § 2810; 72 C.J.S. 691, § 232.) ■ Moreover, the common law rule embodied in section 2819 of the Civil Code (see *ante,* p. 800) contemplates continuing liability of the surety if he consents to the principal's discharge. Thus, the construction of section 2809 which is urged by defendant is inharmonious with other code provisions relating to suretyship, and with established common law rules on the subject.

■ Section 2809 was originally enacted in 1872 in terms substantially similar to the present ones. However, rather than being a codification of the common law, section 2809 is a restatement of a principle of the civil law, having its origin in section 2013 of the Code Napoleon. (See Civ. Code, § 2809 (1872), Code Commissioners' Notes.)[2] That latter law, as enacted in 1804, provided that "The security must not exceed what is due from the debtor, nor be contracted under conditions more burthensome. It may be contracted for a part of a debt only, and under conditions less burthensome.

"The security which exceeds a debt, or which is contracted under conditions more burthensome, is not void; it is only reducible in proportion to the principal obligation." (The Code Napoleon; or, The French Civil Code (1824), London.) This rule of the civil law appears to relate to conditions at the time of the execution of a guarantee agreement, and to provide that at the time of the contracting of the surety's obligations he cannot agree to perform higher and greater obligations than those then imposed on the principal debtor. But nothing in that rule or in its California successor necessarily requires that once the original obligations of the principal and surety are fixed, with the obligation of the surety not in excess of that of the principal, the surety may not further

[2]On the other hand, section 2809 also in effect restates the basic common law rule of suretyship that the obligation of the surety is measured by the obligation of the principal. (See 72 C.J.S. 572-573, § 92, and cases cited therein.)

agree that upon the occurrence of some specified event his liability would remain the same even though the obligation of the principal is thereby decreased. While it has been held that a surety is not liable where the principal does not incur any obligation under the basic contract (*Atowich* v. *Zimmer* (1933), 218 Cal. 763, 769 [5] [25 P.2d 6]), or where the principal has fully performed his contract obligations (*Goatman* v. *Pacific Ready-Cut Homes, Inc.* (1931), *supra,* 112 Cal.App. 397), no case dealing with section 2809 has been found in which it was suggested that where the principal incurs an actual obligation, the surety may not agree to remain liable if the principal is discharged by an arrangement such as a composition of creditors without having fully performed his contract obligation.

 It is a general principle of suretyship law that while a surety cannot be held beyond the express terms of his contract, the contract is to be interpreted by the same rules used in construing other types of contracts, with a view towards effectuating the purposes for which the contract was designed. (*Ryan* v. *Shannahan* (1930), 209 Cal. 98, 101-102 [1] [285 P. 1045]; *Roberts* v. *Security T. & S. Bank* (1925), 196 Cal. 557, 566 [238 P. 673].) Section 2837 of the Civil Code is to the same effect, and section 3268 of that code further provides that the ascertained intent of the parties controls the contract interpretation. The terms of the subject agreement indicate that the parties here intended that defendant should not be released by a composition such as the one effected. Construction of section 2809 to give effect to this agreement is not contrary to the basic policy of the statute; furthermore, carrying out the expressed intent of the parties accords with the basic rules of suretyship law as above stated and as particularly embodied in sections 2837 and 3268 of the Civil Code.

That the above stated view follows the policy of the law is forcefully indicated by the provisions of section 3268 of the Civil Code. That section provides that "Except where it is otherwise declared, the provisions of the foregoing fifteen titles of this part [which includes the Title on Suretyship, §§ 2787-2866], in respect to the rights and obligations of parties to contracts, are subordinate to the intention of the parties, when ascertained in the manner prescribed by the chapter on the interpretation of contracts; and the benefit thereof may be waived by any party entitled thereto, unless such waiver would be against public policy." (See also *Boole*

v. *Union Marine Ins. Co., Ltd.* (1921), 52 Cal.App. 207, 210 [5] [198 P. 416].)

The latter rule was applied in *Fisher* v. *Exchange Nat. Bank* (1920), 46 Cal.App. 191 [188 P. 1033], where the parties by their contract waived a statutory limitation as to the sale of pledged property by the pledgee. The court there stated (p. 193) : ''[I]t was competent for the parties by their contract to waive this limitation. The statute provides the rule that would apply in case there was no agreement to the contrary, but there is nothing in the law to preclude parties from agreeing [to obligations and procedures differing from those prescribed by the statute] . . . In fact, section 3268 of the Civil Code provides that parties may waive the benefit of any statute in reference to their rights and obligations 'unless such waiver would be against public policy.' We may add that no contention is made that the present case comes within said exception.''

The reasoning of the Fisher case is equally applicable here. The parties by their contract specifically agreed that the liability of the surety was not to be terminated by the discharge of the debtor through a composition of creditors. This expressed intention alone might well be controlling under the provisions of sections 3268 and 2837, but even if a waiver of the limitation of section 2809 is necessary, the language of the contract adequately expresses such a waiver. Moreover, no rule or policy precluding a waiver in this case has been suggested. To the contrary, an agreement such as the present one appears to be beneficial to all parties concerned. The creditor is allowed to enter into a composition agreement without losing his security; the principal is able to enter into an orderly composition arrangement without the necessity of going through bankruptcy or receivership; the surety is not placed in a worse position than he was in originally and in addition benefits from the reduction of his obligation to the extent of any payments made by the debtor, on the guaranteed debt, in the composition proceeding (see Civ. Code, § 2822). The surety by guaranteeing a debt assumes liability if the principal is unable to pay. If the principal is totally insolvent, the surety will be compelled to pay the entire debt, but if the principal is able to make some payment on the debt the obligation of the surety is correspondingly reduced. The surety would remain fully liable even though the obligation of the principal was discharged in bankruptcy (see 8 C.J.S. 1548, § 581b and cases cited therein), and the surety

cannot be held to be prejudiced where by consensual agreement he undertakes to remain liable after the obligation of the principal is discharged through a composition or settlement arrangement.

For the foregoing reasons, the judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Spence, J., and McComb, J., concurred.

Appellant's petition for a rehearing was denied July 31, 1957.