[L. A. No. 29470.   In Bank.   Jan. 23, 1968.]

L. DURGIN, Plaintiff and Appellant, v. LEO I. KAPLAN, Defendant and Respondent.

Harry A. Pines for Plaintiff and Appellant.

Loeb & Loeb, John L. Cole and Jerome L. Goldberg for Defendant and Respondent.

TOBRINER, J.—This case presents the question whether a creditor suing on a written agreement guaranteeing payment of indebtedness at maturity and permitting the creditor to receive either cash or securities in settlement may exercise such choice for the first time on appeal from a judgment for defendant guarantor, after the creditor tried and lost its case in the trial court on the theory that the stock it had received in the debtor's Chapter XI bankruptcy proceeding was worth less than the total amount of the claim.

In order to protect guarantors against being cast involuntarily into the role of insurers against creditors' losses from speculative holding of such stock for an indefinite period, we hold that Civil Code section 2822 [1] requires, in case of bankruptcy proceedings, as in the instant situation, that creditors clearly exercise such cash-in-lieu-of-securities choices at the time of confirmation of the plan of arrangement or else be charged with acceptance of the stock received in bankruptcy. We further hold that sufficient evidence supported the jury's finding that at the time of their receipt the securities

---

[1] "The acceptance, by a creditor, of anything in partial satisfaction of an obligation, reduces the obligation of the surety thereof, in the same measure as that of the principal, but does not otherwise affect it."

enjoyed a fair market value equal to the amount of the debt, thereby extinguishing the guarantor's obligation. Finally, we explain why plaintiff cannot now invoke its subrogation theory in spite of its silence upon acceptance of the stock.

In so holding, we do not deny plaintiff's basic premise that in a bankruptcy proceeding a creditor whose agreement of guaranty reserves to it the right to accept securities or to demand cash possesses the remedial option of recovering from the guarantor the full amount of its claim in cash. Upon that recovery the guarantor will become automatically subrogated to the rights in the stock that the creditor received in bankruptcy. Thus our holding does not imply that such a creditor, participating in bankruptcy proceedings, if it properly exercises its choice, *must* accept the stock of the debtor under the bankruptcy decree. Nor does our holding that the creditor may not first exercise such remedial option on appeal rest upon the procedural rule that parties may not ordinarily change legal theories of recovery on appeal. In this respect plaintiff's case falls within certain recognized exceptions to the general rule.[2]

We hold only that the creditor may not ''have his cake and eat it too'': if he wishes to reject the stock and take cash, he cannot make that choice *after* electing to retain the stock; he cannot thereafter sue for the balance of his claim in cash. He cannot retain the option and simultaneously speculate in the value of the stock.

### 1. *The facts.*

The nominal plaintiff is the assignee of Ducommun Metals & Supply Co.,[3] a supplier of materials to Poly Industries, Inc. (incorporated in 1949 as Turbo Products, Inc.), of which defendant guarantor is the principal shareholder, officer and director. In order to obtain credit in 1949, defendant executed a continuing guaranty, portions of which are set forth in the margin,[4] covering purchases by Turbo (Poly) of goods from Ducommun.

---

[2] See *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; *Panopulos* v. *Maderis* (1957) 47 Cal.2d 337, 341 [-303 P.2d 738]; *American Auto. Ins. Co.* v. *Seaboard Surety Co.* (1957) 155 Cal.App.2d 192, 200 [318 P.2d 84].

[3] We use the terms ''plaintiff'' and ''creditor'' hereinafter to designate the creditor company.

[4] ''GUARANTY

Los Angeles, Cal. May 2nd, 1949
''DUCOMMUN METALS & SUPPLY CO.
''Gentlemen:

Economic difficulties beset Poly in 1960, when it fell behind in its current debts. On January 31, 1963, Poly filed a Chapter XI bankruptcy petition. The bankruptcy court on July 18, 1963, approved the plan of arrangement submitted by Poly. Poly remained in continuous operation during the proceedings and thereafter. The plan of arrangement provided for a two-for-five reverse stock split, and the issuance of one share of common stock to each creditor for each dollar of indebtedness in full satisfaction of the claims of the creditors against

''[1] In consideration of your extending credit to TURBO PRODUCTS INC., 12177 Montague Street, Pacoima, California which we hereby request and with whom or in which company we are financially interested and for value received, we hereby jointly and severally guarantee the punctual payment to you at maturity of all his, its or their indebtedness together with the interest thereon as said indebtedness may bear, now, heretofore, and/or hereafter incurred or due.

''[2] Notes and other evidences of indebtedness and things of value may be received by you on account or in adjustment or as security or in settlement of said indebtedness or any portion thereof and the same (and/or the original indebtedness) may be renewed, extended, relinquished, substituted, modified, and/or enforced as you think advisable, all without notice to us or any of us, and without impairing the liability under this guaranty, and the same, and all renewals, extensions, substitutions, and/or modifications thereof are hereby expressly included hereunder until finally paid in cash. Liens, statutory or otherwise, and security of any kind for the payment of any of said indebtedness together with interest thereon and of any renewals, extensions, substitutions or modifications thereof, may be effected, received, renewed, extended, relinquished, substituted, modified, and/or enforced, as you think advisable, all without notice to us or any of us, and without impairing the liability under this guaranty.

''[3] Procedure against said debtor or upon any lien or other security shall not be required as a precedent to enforcing this guaranty.

''[4] . . . . . . . . . .

''[5] . . . . . . . . . .

''[6] We hereby jointly and severally waive notice of the acceptance of this guaranty, notice of sales and/or indebtedness incurred, notice of credit given and of the form thereof, and notice of default, together with demand and presentment for payment.

''[7] This guaranty is a continuing one and shall remain in full force until written revocation is received by you. Such revocation shall only affect indebtedness thereafter incurred and shall only affect the person giving said notice.

''[8] . . . . . . . . . .

''[9] The undersigned, for themselves and each of them, and on behalf of their and each of their heirs, executors, administrators, successors and assigns, hereby waive for the period of ninety-nine years from the date hereof every defense, now, heretofore or hereafter arising of estoppel, laches or any statute of limitations to any obligations or liabilities covered by this guaranty or of the undersigned, or any of them, past, present or future, under this guaranty. The undersigned as Guarantor expressly waives the extension of the obligation of this Guaranty arising by reason of the institution of proceedings by or against the principal

the principal debtor.[5] Ducommun filed a claim in the bankruptcy court, and received shares of common stock equal in number to the amount of Poly's debt in dollars, obtaining a document evidencing that the shares, presently non-transferable, were held in escrow in its behalf, subject to further order of the bankruptcy court. Ducommun extended credit to Poly almost continuously from 1949 until some months prior to March 20, 1963, the date it filed the instant action.

In its complaint, Ducommun alleged the principal debt and the guaranty. The guarantor pleaded as an affirmative defense the creditor's receipt in a Chapter XI bankruptcy proceeding of the principal's stock equal in value to at least the amount of the debt. Plaintiff sought to prove in its case in chief that the stock was valueless. The court gave its requested instruction that judgment for plaintiff should be in the amount of the debt less the fair market value of the stock. In returning a verdict for defendant, the jury necessarily found that the value of the stock equalled or exceeded that of the debt and that the debt was thereby extinguished.

2. *The evidence sufficiently supported the jury's valuation of the stock.*

■ Viewing the evidence most favorably to plaintiff, we find in the record eight substantial pieces of evidence which independently support the jury's valuation of the stock as equal to or greater than that of the underlying debt (i.e., $1.00 per share) :

(1) The creditors, including plaintiff, in the Chapter XI proceeding approved the plan of arrangement of Poly, an ongoing business, which called for the issuance of one share of stock for each dollar of indebtedness after a two-for-five reverse stock split;

---

under and pursuant to Chapter X or Chapter XI or any other provision of the Bankruptcy Act as it now or hereafter may exist, or by reason of any other provision of law which might extend the maturity of the obligation as to the principal; or by reason of the provisions of any moratorium laws or statutes extending the obligation of the principal.

''[10] This guaranty shall inure to the benefit of yourself, your successors and assigns.

''Leo I. Kaplan          8429 Grenoble          Sunland, California.''
(Paragraph numbering added.)

[5] Even in the absence of the specific provision in paragraph 9 of the guaranty agreement, the creditor's participation in Chapter XI proceedings does not extend, waive, or, in the absence of full payment by the principal, satisfy the guarantor's obligation. (Bankruptcy Act, § 16; 11 U.S.C. § 34 (1953); Civ. Code, § 2825; *Bloom* v. *Bender* (1957) 48 Cal.2d 793, 801 [313 P.2d 568]; *Union Trust Co.* v. *Willsea* (1937) 275 N.Y. 164, 167 [9 N.E.2d 820, 112 A.L.R. 1175].)

(2) Poly stock traded as high as $10 per share before the arrangement proceedings commenced; the last sale, in 1962, was at $1.70 per share;

(3) A wholly owned subsidiary of Poly showed a net profit of 11 cents per share outstanding for the year preceding trial;

(4) Defendant, the principal shareholder, testified that he estimated the value of his stock as at least $1 per share, and that he would not sell his stock at that price;

(5) Poly showed a net profit of $20,000 during the seven months preceding trial; as a company engaged in work on jet engines and missile motors under Defense Department contracts, it had, according to defendant, ''a bigger prospect for business at this particular moment than we have had in several years'';

(6) ''Actual book value'' of Poly's assets (including true value of engineering developments stated at zero cost), less liabilities, was $400,000, or 44 cents per share, based on 900,000 shares outstanding;

(7) A salesman who ordinarily earned $60,000 annually agreed to an employment contract with Poly providing for approximately $10,000 per year in cash plus an option to buy 20,000 shares of stock at 25 cents per share; he held options to buy 80,000 more shares at prices up to $1.50 per share;

(8) Another employee expressed verbally his desire to exercise his option to buy 20,000 shares of stock at 25 cents per share.

3. *Plaintiff's election of the remedy of retaining the stock and suing for the difference in cash waived his remedial option of recovering full cash value under a theory of subrogation.*

Defendant guarantor's fifth affirmative defense presented the issue of the effect to be given the creditor's receipt of stock in the bankruptcy arrangement proceeding. Plaintiff tried its case, and lost, on the theory that the stock was worth *less* than the debt. It seeks to prevail on appeal by contending that it was at all times entitled to recover the full cash value of the debt under a provision of the guaranty agreement allowing the creditor to reject securities and demand cash.

Plaintiff produced only one witness: Ducommun's manager of Poly's credit account. At the very outset of its case, plaintiff's counsel sought to elicit the credit manager's opinion that the stock received in the arrangement proceeding was worthless. Defendant successfully objected to his answer on

the ground that no foundation had been laid to qualify him as an expert witness. The balance of plaintiff's case in chief dealt with the value of the stock.

Plaintiff neither raised before the trial court, nor otherwise sought to exercise, its remedial theory of subrogation upon full cash payment, which it urged only on appeal. At the close of the evidence plaintiff requested, and the court delivered, an instruction to the jury to find the value of the stock and to deduct it from the amount of the indebtedness.[6] Plaintiff's citation of *Bloom* v. *Bender, supra,* 48 Cal.2d 793, in its request for a directed verdict demonstrates that it proceeded on the theory that the evidence established as a matter of law that the stock was worthless rather than on its subsequent subrogation theory that the value of the stock was irrelevant. The court in *Bloom* affirmed a jury verdict for plaintiff creditor in the amount of the claim on an open book account less the pro rata dividend received by the creditor upon a general assignment for the benefit of creditors, which constituted a release of the principal debtor. The court stated: "the surety . . . benefits from the reduction of his obligation to the extent of any payments made by the debtor, on the guaranteed debt, in the composition proceeding (see Civ. Code, § 2822)." (48 Cal.2d at p. 804.)[7]

We consider plaintiff's failure to raise its subrogation theory of recovery at trial as a substantive, not merely procedural, matter evidencing its acceptance of the stock. Consequently, we need not rest our holding on defendant's contention that plaintiff, having elected the value theory of recovery at trial and suffered a judgment against it, may not change to a subrogation theory of recovery on appeal. Rather, plaintiff may not now prevail on its subrogation theory because its acceptance of the stock, evidenced by its reten-

---

[6]The instruction reads as follows: "The defendant contends that the 11,723 shares received by Ducommun Metals and Supply Company on or about July 10, 1964 [*sic*], had value in excess of $11,620 [*sic*] owed by Poly Industries, Inc., to Ducommun, and that the indebtedness was thereby paid in full. If you should find that the value of such stock was in fact equal to or in excess of the amount of $11,620 [*sic*], you will find in favor of the defendant. [Further instructions on method of determining fair market value of stock.] If you find that such stock has no market value, you are to award judgment to the plaintiff for the amount of $11,600.20. If you find that such stock does have a market value, your judgment in favor of plaintiff and against the defendant should be for $11,600.20 less the fair market value of said stock." The defendant requested, and the court delivered, a similar instruction.

[7]Plaintiff points to three additional factors in resisting defendant's contention that, having failed to raise its subrogation theory of full cash recovery before the trial court, it tried and lost its case entirely on the

tion of and benefit from the stock, its failure to exercise its option to demand cash, and its affirmative election of the value theory of recovery at trial, brings into operation Civil Code section 2822, and its corollary, section 2839.

Section 2822 provides that the creditor's acceptance of anything in partial satisfaction of an obligation of a principal reduces the guarantor's obligation in the same measure; section 2839 states that *actual* payment of an obligation by a principal, as distinguished from release by the creditor with the consent of the guarantor, or discharge by operation of law (see Civ. Code, §§ 2819, 2825), exonerates the guarantor. The defendant did not agree to waive the protection of those provisions.[8] We cannot, therefore, upset the verdict of the jury that the guarantor's obligation was wholly extinguished by the creditor's acceptance of stock equal in value to the value of the debt. Such acceptance rendered the contract of guaranty fully executed. It terminated any contractual relationship between the parties.

4. *Plaintiff cannot successfully exploit its silence in accepting the stock, or rely upon the agreement of guaranty, to enable it now to advance its subrogation theory.*

Plaintiff maintains that it should not be held to acceptance of the stock in settlement, because its participation in the Chapter XI proceeding was involuntary; its vote of approval for the plan of arrangement merely amounted to

value theory, and therefore must be charged with electing its remedy of accepting the stock. Plaintiff's factors are: (1) that it sued for the full amount of its claim; (2) that the trial court sustained defendant's objection to plaintiff's witness's testimony as to the value of the stock, and (3) that plaintiff asked its witness: ''Are you willing to deliver these shares of stock to Mr. Kaplan upon payment of the stock [*sic*]?''

The record clearly establishes that none of these factors in any way placed before the trial court the subrogation theory of full cash recovery or showed a proper attempt to exercise that remedial option.

First, plaintiff sued for the full value of the debt (a) because its pleading of the debt in its complaint occurred *before* the issue of the receipt of stock was raised in an affirmative defense, and therefore indicated no theory in response to the subsequently raised defense, and (b) because it sought to prove that the stock possessed no value; if plaintiff's suit on the debt had been based upon the subrogation theory of full cash recovery, the value of the stock would have been irrelevant and plaintiff would have moved for summary judgment under Code of Civil Procedure section 437c, or demurred to the affirmative defense of the receipt of the stock under section 443.

Second, the trial court sustained the objection to the credit manager's testimony as to the value of the stock on the sole ground that plaintiff failed to lay a foundation qualifying him to make such an estimate.

Third, the question to plaintiff's witness regarding delivery of the stock to defendant was not a tender of the stock since (a) the question

making the best of a bad situation; it had no choice but to receive and retain the nontransferable stock escrow certificates; and its agreement of guaranty specified that "things of value may be received by you . . . as security . . . until finally paid in cash." We believe, however, that plaintiff's actions and inaction during the course of the bankruptcy and trial proceedings constituted an acceptance of the stock pursuant to contract law and the intention of the parties to the guaranty agreement.

The cardinal policy applicable to the instant issue finds expression in two provisions of the Civil Code: "He who takes the benefit must bear the burden" (Civ. Code, § 3521); "A voluntary acceptance of the benefit of a transaction is a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." (Civ. Code, § 1589.) Thus, in a closely analogous situation, the courts prohibit an offeree who remains silent from reaping the benefits of a contract in which the offeror deemed silence as the mode of acceptance, if the offeree could have later successfully resisted any contractual obligations imposed in such a manner.[9] Here, plaintiff creditor, as the offeree of alternative modes of performance, seeks to treat its silence as both acceptance and rejection, subject to its ultimate choice unlimited as to time. If plaintiff, however, is to receive the benefit of appreciation in value of the stock, it must bear the risk of depreciation. If it wishes to protect itself against the risk, it must exercise its option of rejection before acquiring the opportunity for gain.

---

was not answered, (b) the witness lacked authority to make such a tender, and (c) viewed in context, the question was designed to elicit testimony on the low value of the stock. Plaintiff accepted the trial court's ruling sustaining defendant's objection to the question without calling the court's attention to its subrogation theory; moreover, tender of the stock is irrelevant to the subrogation theory of recovery, since it is not a condition precedent to recovery, and subrogation would automatically follow full cash payment by operation of law.

[8]We doubt the validity of such a provision in a contract of guaranty, which, contrary to public policy, could require a guarantor to pay the debt of his principal many times over before becoming exonerated.

[9]"In two such cases, the offeree made up his mind to accept and remained silent as the specified mode of accepting; yet the court held that no contract had been made. [*Prescott* v. *Jones* (1898) 69 N.H. 305 [41 A. 352]; *Felthouse* v. *Bindley* (1862 Eng.) 11 C.B. N.S. 868.] . . . The opposite rule, in such cases, would enable the offeree to await the event, and to deny the fact of acceptance if the contract now appears to be to his disadvantage, or to assert the fact of acceptance if appearances are to the contrary." (Fn. omitted.) (1 Corbin, Contracts, § 73, p. 311; but see Rest., Contracts, § 72(1b).)

Plaintiff cannot categorically assert that its silence negates acceptance; courts have recognized that in some situations silence constitutes acceptance. "There are many cases in which, because of the past relations of the parties or of accompanying circumstances, the silence of the offeree after receipt of an offer has been held to constitute acceptance. . . .[10]

■ It is clear that a party will not be permitted to receive and enjoy benefits that he knows are being offered to him at a price without paying for them, if he had an opportunity to reject them when they were offered without any expense or material inconvenience. Silence may here consummate his acceptance because the facts fairly call upon him to speak." (1 Corbin, Contracts, § 75, pp. 316, 321.) If one party "used and was in fact benefited" by "a performance that is offered as a substitute for the performance promised" he may be charged with acceptance of the part performance. (5A Corbin, Contracts, § 1126, pp. 21, 22; see also *Katz* v. *Bedford* (1888) 77 Cal. 319, 322 [19 P. 523, 1 L.R.A. 820]; *Cawley* v. *Weiner* (1923) 236 N.Y. 357, 361 [140 N.E. 724].)

■ We believe, therefore, that plaintiff accepted the arrangement-proceeding stock within the meaning of section 2822 not only expressly, by choosing the value theory of recovery *at trial,* but impliedly as well, by remaining silent while accepting the benefits of the stock *after the Chapter XI proceeding.*

Our holding does not conflict with the position, urged by plaintiff,[11] that a creditor, *before acceptance* of stock in a bankruptcy proceeding, may reserve the option of demanding full cash payment from its guarantor and subrogating him to

---

[10]For example, an offeree's receipt and retention of goods without any notice of refusal have been held to constitute acceptance. (*Buffalo Arms, Inc.* v. *Remler Co.* (1960) 179 Cal.App.2d 700, 707-709 [4 Cal.Rptr. 103]; *Banks* v. *Crescent Lumber & Shingle Co.* (1963) 61 Wn.2d 528, 531 [379 P.2d 203]; Rest., Contracts, § 72.)

The receipt and use of unsolicited services or things of value constitute acceptance if the offeree should have known that the things were sent as a definite offer of performance. (*Semi-Tropic etc. Assn.* v. *Johnson* (1912) 163 Cal. 639, 642 [126 P. 488]; *McAulay* v. *Jones* (1952) 110 Cal.App.2d 302, 306, 309 [242 P.2d 650]; *Garst* v. *Harris* (1900) 177 Mass. 72, 73-74 [58 N.E. 174] (Holmes, C. J.); 1 Williston, Contracts (3d ed. 1957) §§ 91, 91A, 91D.)

A voidable contract, such as an unauthorized contract made by an agent, may be ratified by implication from the offeree's or principal's, retention and enjoyment of its benefits. (*Vanciel* v. *Kumle* (1945) 26 Cal.2d 732, 735 [160 P.2d 802]; 2 Corbin, Contracts, § 227, p. 337.)

[11]See Collier on Bankruptcy (14th ed. 1940) § 16, pp. 1530-1531; *Union Trust Co.* v. *Willsea, supra,* 275 N.Y. 164; *Martin Furniture Co.* v. *Massey* (1916) 135 Tenn. 338 [186 S.W. 451].

its rights in the securities. None of plaintiff's authorities suggests, however, that such an option may be exercised for the first time *years after receipt of the stock,* much less after a jury detemination that its fair market value at the time of receipt equalled the value of the principal debt.

If the creditor is to avoid the operation of section 2822 and retain its option to demand cash instead of accepting securities, the creditor must act promptly and clearly to exercise its option at a time before the benefits of appreciation will accrue to it. Normally this time will be the date of the final decree of the bankruptcy court confirming the plan of arrangement.

■ We cannot exhaustively define all of the circumstances which constitute acceptance, nor can we delimit exclusive means of exercise of the option. Appropriate procedures may include, if the securities are transferable, their tender to the guarantor, or, if the securities are not transferable except by operation of law, written notice to the guarantor demanding full cash payment and offering subrogation of the rights in the securities, prayer for such relief in pleadings, and indication of the election of such a theory of recovery in connection with a motion for summary judgment. Needless to say, such action must be taken before acceptance of the securities by the creditor.

■ In the present case, the creditor received and accepted stock in the bankruptcy proceeding; until appeal, it did not at any time expressly indicate in any manner that it wished to receive cash in lieu of the stock; indeed, at trial it submitted the issue of the value of the stock to the jury on the theory that it *had* accepted the stock but that it possessed no present market value. We cannot believe that if the stock had gained in value the creditor would have insisted upon surrendering it after deducting the cash amount of the debt. If we are to follow the creditor's theory, we must lift its silence, or, at best, its equivocation, into the right to gamble with the stock, retaining it if it increases in value but returning it if it decreases, and obtaining any deficiency in value from the guarantor. We cannot import into the relationship of creditor and guarantor a sporting theory of liability.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied February 21, 1968.