Filed 2/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DESIGN BUILT SYSTEMS,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ALEXEI SOROKINE et al.,<br><br>     Defendants, Cross-complainants<br>and Appellants;<br><br>DMITRIY KORNACH et al.,<br><br>     Cross-defendant and Respondent. | A151264, A152059<br><br>(Marin County<br>Super. Ct. No. CIV-12-00737) |

These consolidated appeals assert three claims of error by the trial court. The first was directing a verdict against appellants as cross-defendants on a claim they violated an Internal Revenue Code provision and thereafter awarding $20,000 in sanctions and $122,995 in attorney fees against them. The second was directing verdicts against appellants on claims they had asserted against others, which ruling was premised on appellants' inability to prove damage because the trial court had granted a motion in limine preventing appellants from introducing evidence of payments made to an unlicensed contractor. And the third was awarding cost of proof damages to a party based on requests for admissions propounded by a different party. We agree with appellants on all three claims, and we reverse.

**BACKGROUND**

Appellants are Alexei Sorokine and Elena Koudriavtseva (usually when referred to collectively, appellants). They are husband and wife. Sorokine is the owner of a home in

1

San Rafael (the property), which he had acquired prior to their marriage. In 2010, Sorokine traveled to Russia and has not been able to return.

Respondents are Design Built Systems (DBS), and Dmitriy Kornach and his company, Kornach Construction Company (for convenience, collectively Kornach). DBS and Kornach were represented by separate counsel below, but are represented by one firm here, which has filed a single brief on behalf of both respondents. DBS and Kornach are both California licensed contractors, and both interacted over the years with Sorokine, and later Koudriavtseva, in connection with work done at the property, though in quite different ways. Specifically:

DBS began its relationship with Sorokine in 2006, following a landslide at the property, when it was hired to prepare plans for the installation and construction of retaining walls. In 2010, Sorokine entered into an agreement with DBS to prepare various drawings for the property. And DBS was also retained to remedy a stop work notice issued by the city of San Rafael as a result of prior work performed by others.

In 2011, DBS entered into another—and final—contract for work at the property, this time with Koudriavtseva, the contract giving rise to the litigation here. This contract was for the installation of concrete retaining walls and a driveway, for a price of $175,000. The contract set forth the specific scope of work for the retaining walls and driveway, and also had specific exclusions. In September 2011, after DBS had completed most of the work under the contract, Koudriavtseva fired DBS. She then hired PA Builders, Inc. (PA Builders) to complete the work and remedy what she claimed were defects caused by DBS and others. As will be seen, PA Builders was unlicensed.

As mentioned, Kornach also had significant interaction with Sorokine, but in a much different fashion—and never as a general contractor. Rather, over the years Sorokine undertook significant remodeling work on the property, doing much of the work himself, sometimes with his sons Alexi and Oleg. He also hired labor crews to do work. Kornach, a longtime friend of Sorokine's, agreed to purchase materials for projects at the property because of the discounts afforded to holders of a general contractor's license. Sorokine does not speak English, and Kornach, who did, often interpreted, explained

2

things, or arranged meetings with contractors for Sorokine. Kornach never acted as a general contractor for any work at the property.

Koudriavtseva took over projects at the property after 2010, as Sorokine could not return from Russia. Kornach continued to assist Koudriavtseva through the supply of materials, retention of contractors, and translations. Then, in fall 2011, Koudriavtseva informed Kornach she did not want him on the property any longer.

## THE PROCEEDINGS BELOW

### The Pleadings

In February 2012, DBS filed a complaint against appellants, alleging four causes of action: (1) breach of contract; (2) foreclosure of mechanic's lien; (3) common counts; and (4) account stated.

Appellants' response included a cross-complaint and thereafter amended cross-complaints, the second of which is the operative pleading here. It named as cross-defendants DBS (and its principal, Daniel Owens), Kornach (and its principal Dmitriy Kornach), and American Contractors Indemnity Company (ACIC), which had issued a surety bond to Kornach. The cross-complaint alleged 11 causes of action: (1) breach of written contract; (2) breach of oral contract; (3) breach of implied warranty; (4) negligence; (5) disgorgement; (6) intentional misrepresentation; (7) negligent misrepresentation; (8) rescission and restitution; (9) violation of the California Unfair Business Practice Act 17200; (10) breach of the covenant of good faith and fair dealing; and (11) recovery on contractor's license bonds.[1]

Kornach's response included its own cross-complaint against appellants, alleging causes of action for indemnity, contribution, declaratory relief, and "fraudulent filing." The "fraudulent filing" cause of action in the cross-complaint went through several iterations, ultimately to allege a claim based on Internal Revenue Code section 7434, 26 U.S.C. § 7434 (the section 7434 claim). The section 7434 claim essentially alleged

---

[1] Appellants had been granted leave to file a third amended cross-complaint. They failed to do so until six days before the trial commenced, and the trial court did not allow the amendment.

that appellants had borrowed money from Kornach but failed to repay it; that they filed fraudulent Internal Revenue Service 1099 forms reflecting loan repayments to Kornach; that the 1099 forms caused Kornach to have his tax returns audited and incur additional tax liability; and that appellants did not respond to a letter from Kornach's attorney asking them to correct the 1099 forms.

**Requests for Admissions**

The case did not proceed to trial until January 2017, almost five years after it was filed. Meanwhile, the discovery that had occurred included various sets of requests for admissions.

**The Motion in Limine**

At the start of trial, Kornach made numerous motions in limine, number 17 of which sought to preclude appellants from introducing testimony or documents regarding work performed by unlicensed contractors, including PA Builders. The basis of the motion was that a contract by an unlicensed contractor is void and illegal (*Wilson v. Steele* (1989) 211 Cal.App.3d 1053, 1056), and that Business and Professions Code section 7031 bars all actions, however characterized, that effectively seek compensation for illegal unlicensed contract work. (*Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 147–152.) The trial court granted the motion.

**The Trial**

Trial began on January 24, 2017. Following jury selection, testimony was taken over many days, and numerous exhibits were introduced. On February 8, the twelfth day of trial, the court heard argument on motions for directed verdicts on numerous causes of action, including on the claims asserted against appellants and also on appellants' claims in their cross-complaint. Following relatively brief argument, the trial court granted directed verdicts on almost all of the claims, most of which rulings are not before us here.

However, appellants do contest the directed verdicts against them on their claims against Kornach for breach of oral contract and breach of the covenant of good faith and fair dealing, and their claims against DBS for breach of contract and breach of implied warranty, which directed verdicts were expressly based on appellants' failure to produce

4

evidence of damage. That is, the court found there was sufficient evidence to support a breach, but no evidence of damage. As the court put it in connection with its ruling for Kornach: "There could be evidence that—in that view of the facts, if the jury were to believe all of that, that the defendant—that the—in this case, the Cross-Defendants failed to do something the contract required him to do, which would be to get permits, et cetera, for the work, and that plaintiff was harmed by the failure. There is no evidence that was admitted into this case, how she was harmed, and that would be in the nature of proving damages, and there were no damages alleged. [¶] So, based on that, I do have to grant a directed verdict on breach of oral contract against Kornach and Kornach Construction Company. There was a complete failure of evidence of any damages." Or, as the court said as to DBS: "There is no evidence of any payments [for repairs], because I excluded evidence of payments to unlicensed contractors."

The trial court also granted a directed verdict against appellants in favor of Kornach on the section 7434 claim, which verdict is also contested on appeal.

As a result of the directed verdicts, nothing was left in the case except DBS's claims against appellants. DBS's claim for breach of contract was submitted to the jury, which returned a verdict in favor of DBS in the amount of $32,190. Judgment on the verdict was entered on February 10, 2017, and notice of entry served the same day.

Appellants filed a motion for judgment notwithstanding the verdict (JNOV), which the trial court denied. Appellants then filed a notice of appeal from the judgment on the verdict and denial of the JNOV. However, appellants are not contesting the judgment in favor of DBS or the denial of the JNOV, and they are not at issue here.

**Postverdict Activity**

In light of the trial court's directed verdict for Kornach on its section 7434 claim, Kornach moved for penalties and attorney fees for that claim. Following briefing and argument, the trial court awarded Kornach $20,000 in penalties and $122,956.50 in attorney fees and costs.

DBS moved for a cost of proof award pursuant to Code of Civil Procedure section 2033.420.  Following briefing and argument, the court awarded it $120,749.50.  This award is not contested on appeal.

Kornach also moved for costs of proof.  Following briefing and argument, the trial court awarded Kornach $113,196.50.  This award is challenged on appeal.

On June 20, 2017, the court filed an amended judgment incorporating the court's directed verdicts, its award of damages and fees under the section 7434 claim, and its award of costs of proof, from which appellants filed a timely appeal.

## DISCUSSION

Appellants' appeal asserts three claims of error by the trial court:  (1) granting the directed verdict in favor of Kornach on its section 7434 claim; (2) granting the directed verdicts against appellants on their claims based on appellants' inability to prove damages; and (3) awarding $113,196.50 to Kornach for costs of proof.  We discuss them in order.[2]

**The Directed Verdict on the Section 7434 Claim Was Error**

As noted, one of Kornach's four claims in its cross-complaint was based on 26 U.S.C. section 7434.  Section 7434(a) permits a private cause of action against anyone who "willfully files a fraudulent information return with respect to payments purported to be made to any other person."  Section 7434(b) provides for a civil penalty in the amount of $5,000 per violation, plus costs, and in the discretion of the court reasonable attorney fees.  If the court determines that a party is liable under section 7434, its decision must identify the correct amount that should have been reported.  (§ 7434(e).)

As the Northern District of California has described in *Gidding v. Zurich American Ins. Co.* (N.D. Cal. 2015) 2015 U.S. Dist. LEXIS 151947, *16 (*Gidding*), for Kornach to prevail on this claim, it must prove three elements:  "(1) [Appellants] issued an information return; (2) the information return was fraudulent; and (3) [Appellants] *willfully* issued the fraudulent information return.  *Leon v. Tapas & Tintos, Inc.*, 51 F.

---

[2] For some reason, respondents' brief discusses appellants' claims in reverse order.

6

Supp. 3d 1290, 1297 (S.D. Fla. 2014); *Katzman*[ *v. Essex Waterfront Owners LLC* (2d Cir. 2011)] 660 F.3d 565[,] 568. ('The private right of action created by § 7434(a) applies only [i]f any person *willfully files* a fraudulent information return.')" (*Gidding*, at p. *16.)

Willfulness means more than just establishing that appellants were aware that the return was filed: "To prove willfulness, [Kornach] must show that the [appellants], aware of the duty purportedly imposed by Section 7434, specifically intended to flout the statute." (*Tran v. Tran* (M.D. Fla. 2017) 239 F.Supp.3d 1296, 1298.) " 'Courts have interpreted the term "willfully" as requiring "proof of deceitfulness or bad faith in connection with filing an information return." ' " (*Seijo v. Casa Salsa, Inc.* (S.D. Fla. 2013) 2013 U.S. Dist. LEXIS 167205, *25.) In the context of tax fraud statutes in general, the United States Supreme Court has held that willfulness means the plaintiff must prove the defendant was aware of a duty, and "voluntarily and intentionally violated that duty." (*Cheek v. U.S.* (1991) 498 U.S. 192, 201.)

To sum up, to prevail on its section 7434 claim Kornach had to prove that appellants "willfully" issued a "fraudulent" return. The record here does not support a directed verdict on that claim, not in light of the rules governing directed verdicts.

We confirmed those rules in *North Counties Engineering, Inc. v. State Farm General Ins. Co.* (2014) 224 Cal.App.4th 902 (*North Counties*):

"The law of directed verdicts remains exactly as we described it over 50 years ago, in *Shaw v. Colonial Room* (1959) 175 Cal.App.2d 845, 847–848. Reversing a directed verdict, we observed that '[t]he rule governing the granting of a directed verdict is summarized in *Estate of Lances* [(1932)], 216 Cal. 397, at page 400, as follows: [¶] "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a

7

determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' " [Citations.]' [Citations.]

"Addressing the law in the setting of a nonsuit, the Supreme Court has observed that, because granting the motion removes the case from the jury, 'courts traditionally have taken a very restrictive view of the circumstances under which' a nonsuit is proper. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117–118.) Later elaborating on the point, the court said those 'very restrictive' circumstances are only where ' "interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of plaintiff a judgment for the defendant is required as a matter of law." ' (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839.) Conflicting evidence must be disregarded, including evidence brought out on cross-examination of the plaintiff's witnesses [citation], and the trial court may not weigh the evidence [citation].

"On appeal, we decide de novo 'whether sufficient evidence was presented to withstand a directed verdict. [Citation.] In that sense, we stand in the shoes of the trial court.' [Citation.] And we will reverse if there was substantial evidence tending to prove appellants' case and the state of the law supports the claim. [Citations.]" (*North Counties, supra,* 224 Cal.App.4th at pp. 919–920.)[3]

It is, of course, the fact that most motions for directed verdict are made by defendants, that is, the party that does not have the burden of proof. There are a few cases addressing motions made by the party that has the burden of proof, as Kornach did here, though none is cited by respondents. Our search has uncovered some of these cases, including, for example, *Newing v. Cheatham* (1975) 15 Cal.3d 351, where the

---

[3] We cannot help but observe how wrong respondents' brief is in this regard, as a few quotations from their brief make clear. Thus, they say "judgments on directed verdicts are subject to the substantial evidence standard." Or, on the next page, this: " 'In short, even if the judgment of the trial court is against the weight of the evidence, we are bound to uphold it so long as the record is free from prejudicial error and the judgment is supported by evidence which is "substantial," that is, of " 'ponderable legal significance,' " " 'reasonable in nature, credible, and of solid value . . . .' " ' (*Howard v. Owens Corning* [(1999)] 72 Cal.App.4th [621], 631.)"

Supreme Court affirmed a directed verdict in favor of plaintiff, holding that such is proper only where "the cause of action alleged in the complaint *is* supported, and *no substantial support* is given to the defense alleged by the defendant." (*Id.* at p. 359; italics added.) There, the directed verdict was affirmed because of res ipsa loquitur, the effect of which was to create an "inference of negligence [ ] compelled as a matter of law." (*Id.* at p. 365.) When defendant failed to introduce evidence to rebut the inference, the directed verdict on liability was proper. (*Ibid.*) A similar case is *Sanchez v. Bay General Hospital* (1981) 116 Cal.App.3d 776.

This is not a res ipsa case. There was no inference on which Kornach could rely to prove the requisite elements of its case—and much evidence to show it could not.

By way of background, Kornach's oral motion for directed verdict addressed the section 7434 claim only briefly. Here is the entire "argument": "In the cross-complaint filed by Mr. Carey's office, Kornach—Dmitriy Kornach is not making a claim requesting payment for his services as a general contractor. That cross-complaint is for a personal loan, and it's for a claim regarding filing of fraudulent 1099 forms. [¶] And, actually, at this time on Mr. Carey's behalf, we would like to move for a directed verdict on his cross-complaint, because there has been no evidence submitted opposing those claims. There is no testimony that that loan was not made. There is no testimony regarding the fact that it was not repaid. And, I don't believe there was any testimony controverting the claim of the fraudulent 1099 being filed."

And the trial court granted a directed verdict, apparently misunderstanding the requirements for liability under section 7434, apparently believing—incorrectly—that evidence of filing an incorrect form 1099 was alone sufficient to impose liability under that section. This is the entire ruling: "There was no evidence that was provided that this loan that Mr. Kornach testified to either were not made or that they were repaid. And, there was no evidence that the 1099s which Mr. Kornach alleged were wrongfully submitted, that they were not issued or that there was some theory under which the 1099s were authorized. It's appropriate, therefore, for Mr. Kornach and Kornach Construction

Company, is also entitled to a directed verdict as to their cross-complaint on those issues." The trial court was wrong, for several reasons.

To begin with, there was testimony that the 1099 forms issued to Kornach were not completely wrong, at least not "fraudulent." The gist of Kornach's claim was that he should not have received 1099s indicating Sorokine's repayment of loans to him. However, Kornach testified that in 2006 he loaned $200,000 to Sorokine, admitting they did not have an agreement as to when the loan would be repaid, or the interest it bore. Sorokine had partially repaid the loan when, in 2008, Kornach loaned him an additional $100,000. And as to this, Kornach said he and Sorokine had an oral agreement that the loan would be repaid within a couple of months. Sorokine paid Kornach $160,000 in October 2008, $100,000 in July 2009, and at some point made an additional payment of $10,000.

Second, there was evidence that appellants did not know the 1099s were wrong, let alone fraudulent, when they issued them to Kornach. Indeed, the oral motion for directed verdict did not assert that they knew they were fraudulent when filed. Thus, for example, there was no evidence Sorokine played any role in the issuance of the 1099s. And with respect to Koudriavtseva, her testimony was that she provided her accountant copies of checks that she and Sorokine had written, and it was from those checks that the accountant prepared the 1099s. Were all this not enough, Koudriavtseva testified she had no knowledge of any of the loan transactions between Sorokine and Kornach. This is hardly evidence, let alone undisputed evidence, of "willfulness" or "fraudulent." Put otherwise, there was nothing demonstrating that Kornach would even prevail on the section 7434 claim—let alone it *had* to.

Respondents' brief essentially concedes the point, its argument—for some reason buried in the last pages of their brief—unpersuasive. That argument is all of one and a half pages, an argument that cites not one authority, conceding appellants' position that a verdict on the section 7434 claim would have required the jury to conclude that appellants, acting with subjective bad faith, intentionally issued a fraudulent information tax return. (See *Leon v. Tapas & Tintos, Inc.* (S.D. Fla. 2014) 51 F.Supp.3d 1290, 1297;

10

*Gidding, supra,* 2015 U.S. Dist. LEXIS 151947, *16–*18, and cases there cited; *Seijo v. Casa Salsa, Inc.* (S.D. Fla. 2013) 2013 U.S. Dist. LEXIS 167205, *23–*25.)

Beyond that, respondents' one-and-a-half pages are manifestly deficient. This is what they say: "Once Sorokine became 'unavailable,' Koudriavtseva took control of the family business interests. On April 11, 2012, attorney Scott I. Bassin sent a letter on behalf of Kornach to Koudriavtseva at her home [in San Rafael]. The letter was entitled '1099-Misc issued to Dmitriy Kornach.' Koudriavtseva had 'recently filed' tax returns for the years 2008, 2009, 2010 and 2011. The letter detailed problems Kornach was having with inaccurate 1099 forms Koudriavtseva had sent to the Internal Revenue Service ('IRS'). In some cases, she reported twice the amount of money she had paid and this was causing problems between Kornach and the IRS.

"Bassin's letter was sent to Koudriavtseva by ordinary mail, certified mail and fax on April 11, 2012. The letter explained that the IRS said it would turn the matter over to the FBI if it was not resolved by April 20, 2012. Koudriavtseva claims that none of the copies of the letter from Bassin were received by her. The letter was offered in evidence by Kornach and there was no objection from any party."

Then, after four lines asserting that Koudriavtseva conceded she and Sorokine "owned three other valuable properties," respondents' argument ends with this: "Koudriavtseva did not put on any testimony from any witness on subjects related in any way to IRC section 7434 or any statute or case law related to that code section. [¶] The April 11, 2012 Bassin letter (A-1) and the 1099's (A-2) were admitted without objection. The IRS took over the handling of the tax issues but paid no compensation to Kornach consistent with language of the statute. [¶] Sorokine was not available to testify at deposition or at trial during the five years between the filing of the complaint and the conclusion of the trial. While his wife, Koudriavtseva, did testify that she lacked an interest in the property in question, couldn't speak for her husband and did not understand tax law sufficiently to sign the tax return, she never testified that she couldn't understand the proceedings."

11

As to this, suffice to say that the burden of proof on the section 7434 claim was on Kornach. But beyond that, the best that can be said for Kornach's position is that there was disputed testimony regarding correspondence from Kornach's attorney, correspondence long after the 1099s were issued. In any event, section 7434 does not impose liability for failing to correct 1099s that are later discovered to be inaccurate.

In sum, there was hardly undisputed evidence that would require a verdict in favor of Kornach on the section 7434 claim. There was no evidence at all regarding Sorokine's involvement in the preparation of the 1099 forms, certainly no evidence that he willfully caused fraudulent forms to be filed with the IRS. And with respect to Koudriavtseva, there was no evidence she knew the 1099s to be incorrect when they were filed. But even if there were, it was necessarily a jury question: "[K]nowledge and belief are characteristically questions for the factfinder, in this case the jury. Characterizing a particular belief as not objectively reasonable transforms the inquiry into a legal one and would prevent the jury from considering it." (*Cheek v. U.S., supra,* 498 U.S. at p. 203.) The directed verdict on the section 7434 claim was error.

**The Granting of the Motion in Limine Was Error**

Appellants' second claim of error attacks the directed verdicts on several of their claims against DBS and Kornach based on their inability to prove damage. And since the trial court granted the motions on the basis that appellants could not prove damage, their argument necessarily addresses the motion in limine that held they could not introduce evidence of payments to unlicensed contractors.

By way of background, appellants intended to introduce evidence of payments to PA Builders to establish their cost of repair damages. There was no evidence appellants were aware PA Builders was not properly licensed; indeed, in ruling on the motion in limine, the trial court acknowledged that Koudriavtseva stated she was shown what appeared to be a valid license. Nonetheless, the trial court ruled that evidence of payments to PA Builders was completely excluded from trial. This too was error.

To begin with, there is no doubt that the payments would have provided evidence of the reasonable value of repairs: "The amount actually paid for repairs is some

evidence of the reasonable value of necessary repairs." (*Smith v. Hill* (1965) 237 Cal.App.2d 374, 388.) There is also no doubt the lack of evidence of the cost of repairs led to the court granting directed verdicts against appellants, as the trial court explicitly acknowledged, expressly finding sufficient evidence from which the jury could find liability, but granting the motions for directed verdicts for lack of damages, because "[t]here is no evidence of any payments [for repairs], because I excluded evidence of payments to unlicensed contractors."

Business and Professions Code section 7000 et seq., the "Contractors License Law," provides a "comprehensive scheme which governs contractors doing business in California." (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 282.) "The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business." (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995.)

Business and Professions Code section 7031, subdivision (a), provides that no person "engaged in the business or acting in the capacity of a contractor" can bring an action for compensation for work requiring a contractor's license if the person was not properly licensed at all times during the performance of the work. And subdivision (b) permits a person "who utilizes the services of an unlicensed contractor" to bring an action for disgorgement of "all compensation paid to the unlicensed contractor." (*Judicial Council of California v. Jacobs Facilities, Inc.* (2015) 239 Cal.App.4th 882, 895.) Our Supreme Court has stated that " ' "Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business *outweighs any harshness between the parties*, and that such deterrence can best be realized by denying violators the right to maintain any action for compensation in the courts of this state." ' " (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.,*(2005) 36 Cal.4th 412, 423.)

13

Business and Professions Code section 7031 protects the public in two ways: first, it prohibits unlicensed contractors from suing a customer to recover compensation for work performed and/or material provided. (Bus. & Prof. Code, § 7031, subd. (a)); and second, it allows the customer to sue the unlicensed contractor to recover any amounts paid. (*Id.*, subd. (b).) Neither protection warrants the refusal to allow a property owner, the innocent victim of an unlicensed contractor, to introduce evidence of payments to an unlicensed contractor to support a claim of damage.

There is no authority for the proposition that a person who unwittingly hires an unlicensed contractor to repair work not property performed by someone else is precluded from introducing evidence of the cost of repair. To put it slightly differently, "The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services" (*Hydrotech Systems, Ltd. v. Oasis Waterpark, supra,* 52 Cal.3d at p. 995), not to punish the innocent people who hire them.

*Barry v. OC Residential Properties, LLC* (2011) 194 Cal.App.4th 861 is persuasive. There, plaintiff filed a petition to determine the redemption price for her unit in a common interest development that defendant had acquired in a nonjudicial foreclosure sale (*id.* at p. 864), which determination required the calculation of the price paid at the foreclosure sale, assessments and taxes, and reasonable amounts paid by the purchaser for insurance, maintenance, upkeep, and repair of the property. (*Id.* at p. 866.) Among plaintiff's arguments was the claim that the redemption price should not include payments made to an unlicensed contractor for work performed on the property after the foreclosure sale. (*Id.* at p. 869.) The Court of Appeal rejected this argument, stating, "This case does not involve a collection action by Axcell for the cost of its work. Rather, defendant sought reimbursement from plaintiff for expenses it incurred to maintain and make repairs to the unit, including the amount it paid to Axcell. Thus, the sum claimed is in the nature of indemnification for one who paid by another who in justice should pay." (*Id.* at p. 870.) And the court confirmed that statutes like Business and Professions Code

14

section 7031 must not be used to harm those whom the legislature has sought to protect. (*Ibid.*)

Business and Professions Code section 7031 has no application here because PA Builders is not attempting to recover compensation, directly or otherwise. And precluding evidence of appellants' payments to PA Builders did nothing to further the purposes of that section. All it did was harm innocent appellants.

Respondents' argument attempting to support the trial court's ruling is easily dismissed. Following citation of some boilerplate principles, respondents assert as follows:

"Applying the foregoing to the case at bench, the trial court did not err in interpreting Business and Professions Code section 7031 as precluding evidence of payments to unlicensed contractors because Appellants were in effect seeking recovery of payments fundamentally based on illegal construction contracts. *Lewis & McQueen,* [*sic*] *supra,* and *Ranchwood Communities*[*Limited Partnership v. Jim Beat Construction Co.*(1996) 49 Cal.App.4th 1397]*,* instruct that a court must be free to seek out illegality behind claims or contracts in order to properly ascertain whether or not it will enforce an illegal contract. Here, the trial court followed those principals [*sic*] in precluding evidence of payments Appellants made under to [*sic*] PA Builders under illegal contracts.

"Moreover, that the trial court's ruling was within its purview to seek out illegality and that it correctly ruled on the motion in limine is supported by substantial evidence in the record. Uncontroverted substantial evidence establishes that the unlicensed contractor paid by Appellants had a financial interest in the recovery of payments Appellants sought against Respondents that had been made to unlicensed contractor PA Builders. Eli Abezgaus, a principal of PA Builders, testified at trial, through deposition testimony read into the record, as follows:

"MS. LAWLEY: And this case has significant personal importance to you; is that true?

"A: Yes.

15

"Q: Okay. Would you agree that you are an advocate in the case for Ms. Elena's position in this case?

"A: Partially.

"Q: And, do you have a financial interest in the outcome of this case?

"A: Not at all.

"MS. LAWLEY: Your Honor, I would like to read from Mr. Abezgauz's deposition, Volume 1. [¶] . . . [¶]

"MS. LAWLEY: Line 12 through 18 [page 158].

"THE COURT: You made read those lines.

"MS. LAWLEY: (Reading follows:)

" 'Question: Sir, this goes to question-and-answer. Are you represented by counsel here today?

" 'Answer: Sure.

" 'Question: Okay. And who is your counsel?

"MS. TARAN: No, I don't—

" 'Answer: Okay. No—yeah—no, I'm not represented by counsel.' [Fn. omitted.]"

This is hardly "undisputed evidence" of a financial interest.

Beyond that, the court's conclusion essentially holding that anything pertaining to an unlicensed contractor is somehow barred in California is contradicted by cases recognizing that even unlicensed contractors can themselves bring lawsuits. (See, for example, *Grant v. Weatherholt* (1954) 123 Cal.App.2d 34, 43 [unlicensed contractor could not sue for compensation for performance but could for deceit]; *Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1449 [unlicensed contractor could sue for racial discrimination during cleanup services]; *Epstein v. Stahl* (1959) 176 Cal.App.2d 53, 63 [action to dissolve joint venture].)

**The Award of Cost of Proof Expenses to Kornach Was Error**

As indicated above, following the trial Kornach moved for cost of proof sanctions pursuant to Code of Civil Procedure section 2033.420. All the pertinent papers on the

16

motion are not in the record, and thus precisely what occurred leading to the order is difficult to ascertain. As best we understand it, some of which was confirmed at oral argument, Kornach sought costs of proof against both appellants, in part based on requests for admission propounded by Kornach and in part based on requests for admission propounded by ACIC. And as to the latter, counsel for Appellants argued at the hearing below that "you can't . . . bootstrap someone else's RFAs and use that to your advantage. You have to go ahead and propound your own RFAs. You can't use somebody else's. Here, shortly before trial, ACIC was represented by Ms. Lawley through a substitution of counsel, so Kornach can't—can't jump on that bandwagon."

This colloquy followed:

"THE COURT: What's the law to support that?

"MR. DOUGLASS [counsel for appellants]: That doesn't make any sense.

"THE COURT: If you're a party to an action, and you have to prove something that someone denied in a Request for Admission under oath, why wouldn't the Code of Civil Procedure—the Code of Civil Procedure does not make any distinction that you had to be the propounding party, just that you had to prove something that was unreasonably denied.

"MR. DOUGLASS: I beg to differ. I mean, it's by—if you just look at the statute itself, it doesn't allow for anybody else to jump on the bandwagon, and that would make a mockery of the entire process."

The trial court disagreed, and awarded Kornach $113,196.50. Appellants' last argument is that this award was in error to the extent it was based on requests for admission propounded by ACIC. Again, we agree.

Code of Civil Procedure section 2033.420, subdivision (a) provides: "If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including

17

reasonable attorney's fees."  So, costs of proof are available under that section to the party "requesting that admission . . . ."  That was not Kornach.

Kornach attempts to uphold the award as a proper exercise of the trial court's discretion.  But that is not the standard of review of the issue here, which involves an interpretation of a statute, and thus de novo review.  (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)  The language of the statute is not ambiguous, and the plain meaning of the language must control.  (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919.)  Or, as we put it in *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083, "If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction."

Kornach offers no authority for the proposition that a party may recover cost of proof expenses based upon requests for admission propounded by someone else.  And the authority he does cite, *Bloom v. Bender* (1957) 48 Cal.2d 793, 799, says nothing of the sort.  In *Bloom*, the court stated, "The general rule is that the liability of a surety (in the absence of a different contractual provision) accrues at the same time as that of the principal, or upon default of the principal."  (*Ibid.* at p. 799.)  *Bloom* says nothing about a surety generally "standing in the shoes" of the principal.  And it does not override the plain language of Code of Civil Procedure section 2033.420.

## DISPOSITION

The judgment is reversed.  Sorokine and Koudriavtseva shall recover their costs on appeal.

18

_____
Richman, Acting P. J.

We concur:


_____
Stewart, J.


_____
Miller, J.

*Design Built Systems v. Alexi Sorokine, et al.* (A151264, A152059)

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Honorable Jo-Lynne Q. Lee |
| Attorney for Plaintiff and Respondent Design Built Systems: | Haight Brown et al, LLP, Elizabeth Lawley; Valerie Ann Moore; |
| Attorney for Defendants, Cross-complainants and Appellants Alexi Sorokine and Elena Koudriavtseva: | Archer Norris LLC, Tiffany Ng; Newmeyer & Dillion, Joseph Ficenec; |
| Attorney for Cross-defendants and Respondents Dmitriy Kornach and Kornach Construction: | John E. Carey, Jr. |