Filed 3/7/24  Doyle v. San Diego Metropolitan Transit System CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VERONICA DOYLE et al., | D080998 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2018-00016374-CU-PO-CTL) |
| SAN DIEGO METROPOLITAN TRANSIT SYSTEM, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Reversed in part, affirmed in part.

McKenzie Scott, Timothy A. Scott, and Nicolas O. Jimenez for Plaintiffs and Appellants.

Gordon Rees Scully Mansukhani, Matthew G. Kleiner, Andrea K. Williams; Horvitz & Levy, Lisa Perrochet, and Eric S. Boorstin for Defendant and Respondent.


Veronica Doyle, Julie Blair, and several minors (plaintiffs) appeal from a judgment in favor of San Diego Metropolitan Transit System (MTS) entered after the trial court granted MTS's motions for a nonsuit and directed verdict.

The plaintiffs contend they presented sufficient evidence to preclude nonsuit on two different theories that MTS either created, or had actual or constructive notice of, a dangerous condition on its property. MTS argues the plaintiffs' evidence was insufficient to prove either theory of liability, and that even if their evidence was sufficient, MTS is immune from liability under Government Code sections 818.2, 818.4, and 818.6.[1]

We affirm the judgment as to the plaintiffs' theory that MTS created a dangerous condition by allowing its tenants to operate without the proper permits, code compliance, or certificate of occupancy. We conclude, however, that the trial court erred in granting nonsuit and directed verdict on the plaintiffs' theory that MTS had notice of a platform constituting a dangerous condition on the property, with sufficient time to take protective measures. We further conclude that MTS is not immune from liability on the latter theory. Accordingly, we affirm in part and reverse in part the judgment in favor of MTS.

FACTUAL AND PROCEDURAL BACKGROUND[2]

*A. The Platform Collapse*

MTS owned a building in San Diego which was permitted for use as a storage warehouse. The warehouse did not have a certificate of occupancy for "assembly" use, which would have allowed for large gatherings.

In 2014, MTS leased a portion of the warehouse to San Diego Sports Entertainment Center, LLC (SDSE), a paintball business owned by Diana

---

[1]    Undesignated statutory references are to the Government Code.

[2]    We summarize the facts in the light most favorable to the plaintiffs. (*Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1521 [" 'On appeal from a judgment on a directed verdict, appellate courts view the evidence in the light *most favorable to appellant.*' "].)

Ocampo. In 2015 and 2016, Ocampo communicated with both Timothy Allison, MTS's manager of real estate assets, and Richard Rose, MTS's property manager for the building, about code compliance and permitting issues.

In the meantime, Ocampo started operating her paintball business without the proper permits, and she alerted MTS to the fact that members of the public—including children—were coming to the property for private parties. Allison acknowledged that he knew Ocampo was hosting private parties. In 2015, Ocampo e-mailed him about the lack of exits at the back of the warehouse, among other issues. Later in 2017, Ocampo also e-mailed Rose to ask MTS to upgrade the portable bathrooms at the warehouse because she was losing customers and party bookings due to restroom conditions.

Meanwhile, in April 2017, Ocampo signed an amended lease with MTS to add two subtenants and continue using a portion of the warehouse "as a sports facility, including sporting events, sport fitness training, and virtual reality game entertainment." Ocampo then subleased a portion of her warehouse space to a third subtenant, Vault PK (Vault), which began operating a parkour gym in the spring of 2017. Ocampo informed MTS that Vault was open to the public, including children. Vault's owners were Jessica Funke Ho, Stephen Funke, and Jeff Funke (the Funkes). Jeff Funke spoke with Rose on multiple occasions about obtaining building permits for Vault.

Around September 2017, Ocampo discovered that the Funkes had built an elevated observation platform standing several feet in the air and sitting atop "four-by-four" posts in Vault's subleased space, without her approval. When she saw the platform, her "emotions [were] heightened" and she thought the Funkes were "idiots." Ocampo contacted the Funkes to ask why

3

they built the platform because it would "make permitting a lot harder[.]" She also told them that they should have a structural engineer look at the platform. The Funkes mostly built and designed the platform themselves, even though they did not have a contractor's license in California or the necessary permits.

Ocampo also called Rose, informed him about the platform, and told him she had instructed Vault to consult a structural engineer. Rose had visited the warehouse multiple times during Ocampo's tenancy, including after Vault began using the space. During one visit, Ocampo and Rose walked up onto the platform together. Ocampo told Rose she had "no clue" why Vault built the platform, and that she thought the Funkes were "idiots" for doing so. About a week after Rose and Ocampo stood on the platform, she put caution tape around it to close off access, but someone removed the caution tape. Jeff Funke also stood with Rose on the platform at some point.

Rose denied seeing the platform until later when he visited the property on November 9, 2017. That day, he "perceived . . . something that wasn't right" and he "had a lot of questions about" the platform, but he was unable "to get clear answers[.]" Rose tried calling Ocampo regarding his concerns about the platform on November 10, 2017, because it "was a high priority" for him to get "some answers" and "preferably to meet there on-site."

The next day, on November 11, Jeff Funke was on the platform with a group of children and adults handing out pizza when the platform collapsed, causing injuries to dozens of people. Stephen Funke believed it collapsed because there were not enough nails to attach the platform floor to the wall.

Shortly after the collapse, an inspector for the City of San Diego inspected the property and found several code violations, including a lack of proper permits, insufficient egress exits, inadequate fire safety systems, and

faulty construction relating to the platform. He also observed an unpermitted change of occupancy use, meaning that the building tenants were operating businesses in a manner inconsistent with the allowed storage use. He testified that if not for the unpermitted occupancy or use of the building, the platform would have never existed, there would not have been "30 plus people on that deck[,] and it wouldn't have collapsed."

*B. Trial Proceedings*

The plaintiffs, consisting of adults and minors injured in the incident, sued MTS, SDSE, Ocampo, Vault, and the Funkes. The plaintiffs alleged two theories of liability as to MTS under section 835: (1) that MTS had actual and constructive notice the platform was a dangerous condition, and MTS "could have prevented the harm that ultimately befell" the plaintiffs; and (2) that MTS created a dangerous condition on its property by failing to ensure its tenants obtained proper permits and complied with applicable codes for the warehouse's use as a "family fun zone."

Before trial, the court granted some of MTS's motions in limine, including to exclude evidence regarding code violations reported after the incident, and to exclude evidence of missing permits, code violations, and improper occupancy use of the warehouse after MTS leased the warehouse to SDSE.

After four days of trial, the court heard arguments on MTS's motion for nonsuit, which MTS had filed after the plaintiffs presented their evidence, and MTS's motion for a directed verdict, which MTS brought at the close of evidence. The court granted both motions, finding in a written judgment that there was "no evidence" to support either of the plaintiffs' theories of liability. The court also found that the plaintiffs could not prove MTS's conduct proximately caused their injuries. The plaintiffs timely appealed.

5

DISCUSSION

The plaintiffs contend they presented sufficient evidence that the warehouse became a dangerous condition under section 835 when MTS allowed it to operate as a "family fun zone" without proper permits and inspections. Alternatively, they argue that MTS had actual or constructive notice of the platform and its dangerous condition, and that MTS had sufficient time before it collapsed to take protective measures. We address each theory, and MTS's immunity arguments, in turn.

I

*A.    Governing Law*

Section 835 provides:

> "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> "(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> "(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Section 835.2 provides, in relevant part:

> "(a) A public entity had actual notice of a dangerous condition within the meaning of subdivision (b) of Section 835 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.

6

"(b) A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character."

Section 830 defines "dangerous condition" as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a).) "The existence of a dangerous condition ordinarily is a question of fact, but the issue may be resolved as a matter of law if reasonable minds can come to only one conclusion. [Citation.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1133.) Section 830 also provides that "protect against" includes "repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition." (*Id.*, subd. (b).)

On appeal from a nonsuit or directed verdict, we decide de novo whether " 'when, disregarding conflicting evidence and giving to plaintiff[s'] evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff[s] if such a verdict were given.' [Citations.]" (*Design Built Systems v. Sorokine* (2019) 32 Cal.App.5th 676, 685–686, internal quotation marks omitted (*Design*); see also *Baker v. American Horticulture Supply, Inc.* (2010) 185 Cal.App.4th 1295, 1308 (*Baker*) [trial court's power to grant a nonsuit is the same as the power to direct a verdict].) In other words, we determine whether judgment for a defendant is required

7

as a matter of law when " ' "interpreting the evidence most favorably to plaintiff[s'] case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of plaintiff[s,]" ' " and disregarding conflicting evidence. (*Design*, at p. 686.)

*B. Analysis*

We begin by addressing whether the plaintiffs presented sufficient evidence to preclude nonsuit and directed verdict on their "family fun zone" theory that MTS created a dangerous condition by allowing Vault and SDSE to operate without the proper permits and certificate of occupancy.

We conclude the trial court did not err by granting nonsuit and directed verdict on this theory. As an initial matter, we reject the plaintiffs' assertion that the mere dangerous *use* of a property, without some *physical* defect or condition increasing the risk of harm, can constitute a dangerous condition. "Although there need not be any physical defect in property owned by a public entity, there must be something about the physical condition of the property where an injury occurred which increased the risk of harm to plaintiffs." (*Pekarek v. City of San Diego* (1994) 30 Cal.App.4th 909, 916.) To the extent the plaintiffs assert that Vault and SDSE's mere unpermitted use of the warehouse constituted a dangerous condition, this allegation falls short because it does not tie that use to a physical condition of the property itself. (See, e.g., *Avedon v. State of California* (2010) 186 Cal.App.4th 1336, 1344 [sustaining the state's demurrer in a suit involving a fire started in a cave on state park property because the plaintiffs did "not allege facts to establish a defect in the cave itself or in the nearby vehicular access to that area of the park"]; *State of Calif. v. Superior Court* (1995) 32 Cal.App.4th 325, 328–329 [allowing a trail to be used by mountain bikers, who then caused a horse to

8

buck its rider, was not a dangerous condition absent a physical defect in the trail].)

Here, however, the plaintiffs arguably did allege and present evidence linking the unpermitted use of the property to physical conditions. Specifically, they asserted that the property was dangerous because the warehouse lacked the exits, restrooms, and fire safety systems to comply with applicable codes for its use as a sports facility.[3]  But even if MTS created a dangerous condition by allowing its warehouse to be used as a "family fun zone" without these required physical improvements, the plaintiffs' evidence did not show that the absence of those improvements "created a reasonably foreseeable risk *of the kind of injury which was incurred*[,]" as required under section 835.  (§ 835, italics added.)  The plaintiffs argue a jury "could have easily found that it was foreseeable that the unpermitted occupancy could result in harm" to the plaintiffs, and that only the general nature of the harm needs to be foreseeable.  (See *Constantinescu v. Conejo Valley Unified School Dist.* (1993) 16 Cal.App.4th 1466, 1474 ["The precise nature of the accident need not be foreseeable, only the general character of the event or harm."].)  More recent case law suggests otherwise:

> " 'Before the enactment of the Government Claims Act, the
> only requirement was that the dangerous or defective
> condition be a proximate cause of the injury.  [Citation.]

_____

[3]     The plaintiffs contend that the trial court's in limine rulings "severely limited" the evidence the jury could consider regarding their "family fun zone" theory.  To the extent the plaintiffs challenge those rulings, we agree with MTS that their arguments lack specificity and development.  (See *Ables v. A. Ghazale Brothers, Inc.* (2022) 74 Cal.App.5th 823, 828 [considering undeveloped arguments lacking sufficient citations to authority and to the record to be forfeited].)  But we need not and do not decide whether the plaintiffs have forfeited their challenge to the court's in limine rulings, nor do we decide whether these rulings were proper, because the plaintiffs acknowledge that they are not dispositive to this appeal.

However, after the enactment of Govt C § 835, the plaintiff was also required to establish that the dangerous condition created a reasonably foreseeable risk of the *kind of injury* that was incurred. The fact that the Act included both requirements suggests that the legislature intended to change the former law from requiring only a showing of general foreseeability to requiring a showing that *the precise manner in which the injury occurred* was reasonably foreseeable.' " (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1040, italics added, quoting Van Alstyne et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar 2019) § 12.40, p. 12-61.)

We need not resolve this conflict, however, because there was no evidence that the plaintiffs' injuries from the collapsed platform, either generally or specifically, were the foreseeable result of a lack of proper egress, restrooms, or fire safety. In other words, the plaintiffs did not present evidence showing how the lack of these physical improvements *themselves* created a reasonably foreseeable risk that the plaintiffs would suffer the kind of injury they did from the collapsed platform. The plaintiffs' own witness agreed that the platform failed because it was poorly constructed and built without the proper permits, not because of "bathrooms or the fire suppression violations[.]" The same witness also agreed that "the lack of required emergency egress exits at the warehouse had nothing to do with the platform collapsing[.]"

Because the plaintiffs presented insufficient evidence—even when viewed favorably to them—that the warehouse's unpermitted use as a "family fun zone" created a reasonably foreseeable risk of the kind of injury the plaintiffs suffered, we affirm the trial court's grant of nonsuit and directed verdict to MTS as to that theory of liability. (See *Design, supra*, 32 Cal.App.5th at p. 686.)

10

## II

We turn next to the plaintiffs' theory that MTS had actual or constructive notice of the platform and its dangerous condition, and that MTS had sufficient time before its collapse to take protective measures. On this theory, we agree with the plaintiffs that when interpreting the evidence most favorably to their case and resolving all inferences in their favor, there was sufficient evidence to preclude nonsuit and directed verdict. (*Design, supra*, 32 Cal.App.5th at p. 686.)

There was substantial evidence that MTS had notice of the platform before its collapse. Testimonial and video evidence showed that Rose was not only told about the platform, but he also visited the warehouse on multiple occasions after Vault built the platform. Ocampo and Jeff Funke both testified that they stood with Rose on the platform before the accident, and Rose himself said he saw the platform on November 9, 2017, two days before it collapsed.

There was also evidence that Rose knew of the platform's dangerous condition. Photographs and testimony showed that the platform sat atop "four-by-four" posts and rose several feet in the air. Ocampo, a layperson, said she told Rose about the need to consult a structural engineer about the platform, and that the Funkes were "idiots" for building it. Ocampo said that when she saw the platform, her "emotions [were] heightened" and she was concerned enough about the platform's safety that she put caution tape around it. Even Rose said that when he saw the platform, he "perceived . . . something that wasn't right," he "had a lot of questions about" it, and he tried to call Ocampo because it "was a high priority" to get "some answers" and "preferably to meet there on-site." Although MTS points to other evidence that the platform appeared stable to the untrained eye, and

11

that Rose's concerns were only about the "purpose" of the platform as opposed to its safety, we do not reweigh the evidence at this stage and instead draw all inferences in favor of the plaintiffs. (See *Baker, supra*, 185 Cal.App.4th at p. 1308.) Given this evidence and the applicable standard of review, we cannot conclude as a matter of law that MTS had neither actual nor constructive notice that the platform was a dangerous condition.

Lastly, there was sufficient evidence to permit a jury to find that MTS had enough time before the platform collapsed to take protective measures. Section 830 provides that "protect against" includes "repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition." (*Id.*, subd. (b).) Although Rose disputed that he had seen the platform before November 9, 2017, as noted, we disregard conflicting evidence in our review of nonsuit and conclude that a jury could infer from the testimony of Ocampo and Jeff Funke that Rose knew about the platform for longer than two days before the incident. (See *Design, supra*, 32 Cal.App.5th at p. 686.) But even if a jury concluded that Rose only learned of the platform on November 9, 2017, the jury could still find he had sufficient time to request that Vault or Ocampo put up a warning sign about the platform, limit the number of people allowed on it, discontinue its use, or restrict its access with caution tape, as Ocampo did at one point. He could have taken those actions on November 9, 2017, or even returned the following day to make similar requests. On this record, we cannot conclude as a matter of law that MTS lacked sufficient time to take protective measures. (See *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1213 ["It remains a question of fact for the jury whether, under all the circumstances, the defective condition existed long enough so that it would have been discovered and remedied by an owner . . . ."].)

12

Both the trial court and MTS relied on the argument that MTS did not "control" the property because it was leased to a tenant, and that MTS had no duty to inspect it to ensure code compliance. We find this reasoning inapplicable here. First, MTS did not need to have immediate control over the premises to be liable because section 830, subdivision (c), defines "public property" for section 835 purposes as "real or personal property *owned or controlled* by the public entity[.]" (Italics added.) There is no dispute that MTS owned the property. Second, section 835 provides that MTS can be liable *either* for creating a dangerous condition by an act or omission under subdivision (a), *or* for having notice of a dangerous condition with sufficient time to take protective measures, under subdivision (b). Subdivision (b) does not require that the property owner have a duty to inspect the premises as a prerequisite for liability. Third, the cases MTS cites are not helpful to its position because they involved private landlord-tenant relationships falling outside of section 835's purview, and those cases did not preclude liability where the owners had access to their properties and notice of a dangerous condition. (See *Salinas v. Martin* (2008) 166 Cal.App.4th 404, 408 [private owner of a residence, who had knowledge of an invitee's dangerous dog and who retained possessory control over the residence, owed a duty of care to another invitee hired to work at the owner's residence]; *Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 507 [holding a duty of care arose when a private property owner had actual knowledge of a tenant's dangerous dog, and the owner had the right to remove the animal by retaking possession of the premises]; cf. *Garcia v. Holt* (2015) 242 Cal.App.4th 600, 602 [private landowners owed no duty to a landscaper injured by explosives that a tenant brought onto the property without the owners' actual knowledge].)

13

The trial court also found MTS's own conduct did not proximately cause the plaintiffs' injuries because while the platform was the proximate cause of the plaintiffs' injuries, MTS "had no role in building the platform[,] nor did any of the other alleged defects affecting the building make the platform any more or less dangerous than it was after Vault PK built it." But again, the fact that MTS itself had no role in building the platform does not preclude liability under section 835, subdivision (b) if MTS had *notice* of the dangerous condition, with sufficient time to protect against it. We cannot conclude as a matter of law that MTS's failure to take protective measures did not proximately cause the plaintiffs' injuries. (See *Kaney v. Custance* (2022) 74 Cal.App.5th 201, 212 [" 'The issue of causation may be decided as a question of law only if, under undisputed facts, there is no room for a reasonable difference of opinion.' [Citations.]"].)

We therefore conclude that granting nonsuit and directed verdict was improper as to the plaintiffs' theory that the platform constituted a dangerous condition of MTS's property. We turn next to MTS's argument that it is immune from liability even if the evidence precludes nonsuit.

### III

MTS argues it is immune from liability pursuant to sections 818.2, 818.4, and 818.6. We disagree.

Section 818.2 provides that a public entity "is not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." This immunity does not apply here. First, MTS only asserts this immunity in connection with the plaintiffs' "family fun zone theory," which we have concluded lacks evidentiary support for other reasons. Second, section 818.2 only provides immunity for " 'legislative or quasi-legislative action, and the *discretion* of law enforcement officers in carrying out their

14

duties . . . .' " (*Morris v. County of Marin* (1977) 18 Cal.3d 901, 916–917.) Section 818.2 does not apply here because this case does not involve any legislative or quasi-legislative action by MTS, nor does it involve the exercise of discretion as contemplated by section 818.2. (See *Nunn v. State of California* (1984) 35 Cal.3d 616, 622 [the immunity under section 818.2 attaches only to discretionary functions].)

Sections 818.4 and 818.6 are inapplicable by their own terms. Section 818.4 provides, in relevant part, that "[a] public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit . . . *where the public entity or an employee of the public entity is authorized by enactment* to determine whether or not such authorization should be issued, denied, suspended or revoked." (Italics added.) Again, MTS only argues this immunity applies to the plaintiffs' defunct "family fun zone" theory. But this section is also inapplicable because MTS does not assert that it was authorized to determine whether to issue, deny, suspend, or revoke any of the permits or certificates at issue here.

Section 818.6 provides that "[a] public entity is not liable for injury caused by its failure to make an inspection, or by reason of making an inadequate or negligent inspection, of any property, *other than its property* (as defined in subdivision (c) of Section 830), for the purpose of determining whether the property complies with or violates any enactment or contains or constitutes a hazard to health or safety." (Italics added.) As noted, section 830, subdivision (c)'s definition of "public property" includes property "owned or controlled by the public entity[.]" There is no dispute that MTS owns the property at issue here, which excludes MTS from section 818.6 immunity.

15

Because we conclude that none of the immunities MTS asserts applies in these circumstances, and because we also conclude that the trial court erroneously granted nonsuit and directed verdict as to one of the plaintiffs' theories of liability, we partially reverse the judgment in MTS's favor.  (See *Design, supra*, 32 Cal.App.5th at p. 686 [" 'And we will reverse [a directed verdict] if there was substantial evidence tending to prove appellants' case and the state of the law supports the claim.  [Citations.]' "].)

## DISPOSITION

The judgment granting nonsuit and directed verdict to MTS is reversed as to plaintiffs' theory that the platform was a dangerous condition of MTS's property.  The judgment granting nonsuit and directed verdict to MTS is affirmed as to plaintiffs' theory that MTS created a dangerous condition by allowing tenants to operate a "family fun zone" on its property without the proper permits, code compliance, or certificate of occupancy.  The case is remanded for further proceedings consistent with this opinion.  The plaintiffs are to recover their costs on appeal.

BUCHANAN, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.